RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0057p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

No. 13-6349

*v.*

PATRICK J. WINTERS,

*Defendant-Appellant*.

---

Appeal from the United States District Court
for the Eastern District of Tennessee at Chattanooga.
No. 1:12-cr-00102-1—Harry S. Mattice, Jr., District Judge.

Argued: December 3, 2014

Decided and Filed: March 31, 2015

Before: BOGGS and GRIFFIN, Circuit Judges; and HOOD, District Judge.[*]

---

## COUNSEL

**ARGUED:** C. Mark Pickrell, THE PICKRELL LAW GROUP, P.C., Nashville, Tennessee, for Appellant. Terra L. Bay, UNITED STATES ATTORNEY'S OFFICE, Chattanooga, Tennessee, for Appellee. **ON BRIEF:** C. Mark Pickrell, THE PICKRELL LAW GROUP, P.C., Nashville, Tennessee, for Appellant. Terra L. Bay, UNITED STATES ATTORNEY'S OFFICE, Chattanooga, Tennessee, for Appellee.

---

[*]The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

———————————

**OPINION**

———————————

BOGGS, Circuit Judge.  Defendant-Appellant Patrick J. Winters appeals from the district court's denial of his motion to suppress drug evidence discovered by the police following a traffic stop and dog sniff.  In August 2012, a Chattanooga, Tennessee police officer stopped a rental car, in which Winters was the passenger, for speeding.  During the stop, the occupants' nervous behavior, inconsistent and implausible travel plans, and suspicious rental arrangement led the officer to believe that the occupants may have been trafficking contraband.  After he had completed issuing a warning ticket for speeding, the officer extended the traffic stop for four minutes to retrieve his drug-detection dog from his cruiser.  Twenty-four minutes after the stop was initiated, the officer deployed his dog around the rental car, and the dog alerted to the presence of narcotics.  Upon searching the vehicle, the officer discovered a one-kilogram package of heroin in Winters's bag on the back seat.  Winters was arrested and charged with possession with intent to distribute heroin.  He later moved unsuccessfully to suppress the drug evidence and entered a conditional guilty plea that reserved his right to appeal the denial of his suppression motion.

On appeal, Winters asserts that the officer unreasonably extended the traffic stop of the rental car in order to conduct a dog sniff, in violation of the Fourth Amendment.  In addition, Winters argues that the Supreme Court's decision in *Florida v. Jardines*, 133 S. Ct. 1409 (2013), establishes that a dog sniff of an automobile must be justified by probable cause, and not mere reasonable suspicion.

We hold that, under the totality of the circumstances, the officer had reasonable, articulable suspicion of criminal activity that justified extending the stop for a few minutes to conduct a dog sniff using a drug-detection dog that was already on the scene.  Furthermore, the Supreme Court's decision in *Jardines* is premised on a trespass rationale involving the special protection accorded to the home and, therefore, it does not alter the analysis for traffic stops.  In any event, the officer was entitled to reasonably rely in good faith on the binding precedent existing at the time of the traffic stop, which established that the use of a drug-detection dog

during a lawful traffic stop does not require probable cause.  As a result, we affirm the denial of Winters's motion to suppress.

I

A

Winters was arrested in connection with a traffic stop conducted by Chattanooga Police Officer Jason Duggan on August 9, 2012.  Following the use of a drug-detection dog during that stop, Officer Duggan discovered a one-kilogram package of heroin in Winters's bag on the back seat of the rental car in which he was traveling.  Winters later pleaded guilty to possession with intent to distribute at least one kilogram of heroin, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A), on the condition that he preserve his right to appeal the denial of his motion to suppress the drug evidence.

The magistrate judge assigned to consider Winters's motion held an evidentiary hearing on December 21, 2012, at which Officer Duggan testified.  Following the hearing, the magistrate judge issued a report and recommendation recounting the largely undisputed facts and finding, among other things, that the stop was not unreasonably extended when Officer Duggan conducted a dog-sniff inspection after he completed the warning ticket for speeding.  *United States v. Winters*, No. 1:12-CR-102, 2013 WL 1498075 (E.D. Tenn. Jan. 22, 2013).  Although the original purpose of the traffic stop was concluded, the magistrate judge determined that Officer Duggan developed reasonable, articulable suspicion of criminal activity that justified extending the stop beyond what was originally permissible based on the speeding violation alone.  *See id.* at *10.  Winters did not object to the facts outlined in the magistrate judge's report, only to the legal conclusions regarding, inter alia, the reasonableness of the dog sniff. The district court subsequently adopted the report and recommendation and denied Winters's motion to suppress on April 10, 2013.  *United States v. Winters*, No. 1:12-CR-102, 2013 WL 1482925 (E.D. Tenn. Apr. 10, 2013).  The factual background presented below is largely derived from the magistrate judge's report and recommendation.

B

At 12:04 a.m. on August 9, 2012, Officer Jason Duggan, patrolling with his dog, Red, in a K-9 unit assigned to the Chattanooga Police Department's Highway Interdiction Team, stopped a rental car on I-24 for driving 72 mph in a 55 mph zone. Officer Duggan approached the car at 12:06 a.m., and spoke with the driver, Jessica Harris, who acknowledged that she was driving in excess of the speed limit. Ms. Harris appeared nervous when questioned by Officer Duggan. She apologized to Patrick Winters, who was the only passenger in the car, for speeding, and trembled as she produced her license. Ms. Harris informed Officer Duggan that she was en route to Memphis from Georgia.

When Officer Duggan requested the contract for the rental car, Winters handed him all of the vehicle's registration paperwork and stated that he was responsible for the car even though it was rented in his cousin's name. When Officer Duggan returned to his patrol car to examine the rental contract, he learned that the car was rented in Atlanta, Georgia by Robin Winters at 7:45 p.m. on August 8, roughly four hours before the stop was made; Robin Winters was the only authorized driver; and the rental car was due to be dropped off in Chicago, Illinois at 5:00 p.m. that evening, August 9. Officer Duggan found this information suspicious, as Ms. Harris had stated that she was going to Memphis, not Chicago; neither Ms. Harris nor Winters was an authorized driver; and a car rented for less than a day was making an out-of-the-way journey through Memphis en route to Chicago.

At 12:12 a.m., Officer Duggan had Ms. Harris get out of the car and began to write her a warning ticket for speeding. He further questioned Ms. Harris regarding her travel plans and learned the following: 1) Winters was Ms. Harris's cousin and he frequently traveled from Chicago to Atlanta; 2) they were traveling to Memphis to visit Ms. Harris's family and then rest, and would continue on to Chicago where Winters would remain; 3) Ms. Harris would fly back to Atlanta from Chicago after a day or so; and 4) the car was rented by another cousin. Ms. Harris did not mention Chicago as their destination until Officer Duggan asked where she was traveling after Memphis. Officer Duggan's suspicions were further aroused by Ms. Harris's descriptions of her travel plans, which involved a significant detour of 200 miles to Memphis during a trip from Atlanta to Chicago, all within the period of less than 24 hours for which the car was rented.

He believed that these plans were implausible and inconsistent with Ms. Harris's statement that she was traveling to Memphis to visit family and rest.

At 12:17 a.m., Officer Duggan informed Ms. Harris that he would finish the warning citation after speaking to Winters about the rental contract. At the evidentiary hearing held by the magistrate judge, Officer Duggan testified that, by 12:17, he had "addressed" the speeding violation, though he had not yet completed the section of the warning ticket regarding consent to search the vehicle, which he completes on every ticket that he writes.

Officer Duggan then left Ms. Harris near his patrol car and returned to the rental car to question Winters. As Officer Duggan approached, Winters was speaking on his cell phone but abruptly hung up. Winters told Officer Duggan the following: 1) Winters and Ms. Harris were going to Memphis for about two days (which conflicted with Ms. Harris's initial statements and the rental agreement); 2) Ms. Harris would fly back to Atlanta from Memphis (and not from Chicago as Ms. Harris claimed); 3) Winters would travel alone to Chicago; and 4) Winters's cousin who rented the car could easily add time to the rental contract or pay a late fee. Winters "nervously engaged in excessive talking" throughout the encounter, and, like Ms. Harris, he did not mention traveling to Chicago until Officer Duggan asked where they were going after Memphis. Ms. Harris herself continued to pace and move around nervously as she waited outside the car while Officer Duggan spoke to Winters. Suspicious that criminal activity was afoot, Officer Duggan radioed for backup at 12:21 a.m. He then returned to speak with Ms. Harris.

Around 12:22 a.m., Officer Duggan obtained Ms. Harris's telephone number to include on the warning ticket. Ms. Harris seemed surprised when Officer Duggan told her that Winters claimed they were staying in Memphis for two days, and Officer Duggan testified that Ms. Harris's behavior changed when he asked her if there was anything illegal in the car and if she had any packages. Ms. Harris denied having any illegal items and claimed that she was only responsible for her purse and one bag, and she denied consent to search the car. She then signed the warning ticket at 12:24 a.m., which completed the citation. At this time, Officer Duggan informed Ms. Harris that he was going to deploy his dog on the car, and he returned to speak with Winters. Winters admitted to being responsible for all items in the car, including his bag on

the back seat. According to Officer Duggan, when he asked Winters if he would consent to a search of the car, Winters said that there was nothing illegal in the car and "something to the effect of 'you can do whatever you want to do' and 'yeah, go ahead.'" Officer Duggan, however, did not accept Winters's statements as consent. After backup arrived around 12:25 a.m., Officer Duggan returned to his patrol car to retrieve his dog, Red.

Officer Duggan deployed Red at the rental car at 12:28 a.m. Red immediately alerted to the presence of narcotics near the passenger-side door. While Officer Duggan was returning Red to the patrol car, Winters removed a small bag of marijuana from his pants and threw it into the grass alongside the road. When Officer Duggan returned, he informed Ms. Harris and Winters about Red's alert and asked them if they had any drugs. Winters admitted to possessing and hiding the marijuana and helped Officer Duggan retrieve the bag. At 12:32 a.m., Officer Duggan searched the car and found a one-kilogram package of heroin in Winters's bag on the back seat. Winters and Ms. Harris were placed under arrest.

II

We review the district court's decision on a motion to suppress under a mixed standard of review. *United States v. Davis*, 430 F.3d 345, 351 (6th Cir. 2005). Under this approach, "we review the district court's findings of fact for clear error and its conclusions of law de novo." *United States v. Johnson*, 656 F.3d 375, 377 (6th Cir. 2011) (quoting *United States v. Gross*, 624 F.3d 309, 314 (6th Cir. 2010)). When the district court has denied the motion, "we consider the evidence in the light most favorable to the government." *United States v. Rose*, 714 F.3d 362, 366 (6th Cir. 2013).

Whether a seizure is reasonable is a question of law, which we review de novo. *United States v. Campbell*, 549 F.3d 364, 370 (6th Cir. 2008). We also review de novo whether an officer had reasonable suspicion to justify extending a traffic stop, which is a mixed question of law and fact. *Ibid.* Although our review of this mixed question is de novo, the lower courts are "at an institutional advantage, having observed the testimony of the witnesses and understanding local conditions," and, therefore, "'due weight' should be given to the inferences drawn from the facts by 'resident judges.'" *United States v. Townsend*, 305 F.3d 537, 542 (6th Cir. 2002) (internal citation omitted). "Ultimately," however, "'[i]t is the [Government's] burden to

demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.'" *United States v. Johnson*, 482 F. App'x 137, 143 (6th Cir. 2012) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)) (alterations in original).[1]

III

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. "[S]topping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth Amendment], even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). The question of whether a particular traffic stop passes constitutional muster is analyzed under "the standard for temporary detentions set forth in *Terry v. Ohio*, 392 U.S. 1 (1968), and its progeny." *United States v. Everett*, 601 F.3d 484, 488 (6th Cir. 2010). Under this framework, the stop must be 1) "justified at its inception"; and 2) "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20. If an officer develops reasonable and articulable suspicion of criminal activity during a stop, "he may extend [the] traffic stop long enough to confirm or dispel his suspicions. Any such extension, though, must be 'limited in scope and duration.'" *Johnson*, 482 F. App'x at 143 (quoting *Royer*, 460 U.S. at 500).

---

[1]Winters argues that this approach is not appropriate here because the district court did not hear any evidence itself and its determination was based entirely on a de novo review of the magistrate judge's report and recommendation. Thus, Winters maintains, "this Court is in exactly the same position as the district court in reviewing the magistrate judge's recommendation," and "[b]ecause the district court's review of the magistrate judge's recommendation . . . was de novo, this Court's review should logically be entirely de novo as well, without a presumption of correctness." Appellant Br. 12 n.2. However, a district court only engages in de novo review of "those portions of the [magistrate judge's] report or specified proposed findings or recommendations to which objection is made," 28 U.S.C. § 636(b)(1)(C), and Winters did not object to "the basic facts as outlined" in the magistrate judge's report in this case, but only to the "findings and the legal conclusions as they relate to those facts." *United States v. Winters*, No. 1:12-CR-102, 2013 WL 1482925, at *1 (E.D. Tenn. Apr. 10, 2013). Thus, we will follow the normal approach of reviewing the factual findings adopted by the district court for clear error. To the extent that Winters raises Article III concerns regarding deference to the magistrate judge's findings of fact as adopted by the district court, we note that the Supreme Court has made clear that Article III is satisfied "so long as the ultimate decision" regarding the proposed findings "is made by the district court," *United States v. Raddatz*, 447 U.S. 667, 683 (1980), as it was in this case. District judges may properly give to a magistrate judge's proposed findings "such weight as [their] merit commands and the sound discretion of the judge warrants," *Mathews v. Weber*, 423 U.S. 261, 275 (1976), without being required to have the evidence at issue presented to them personally. *Raddatz*, 447 U.S. at 676, 683–84.

## A. Initial Stop and Questioning

There is no dispute that the traffic stop of the rental car in which Winters was a passenger was lawful at its outset.[2] It is well-established that where an "officer has probable cause to believe that a traffic violation has occurred or was occurring, the resultant stop is not unlawful and does not violate the Fourth Amendment." *United States v. Bradshaw*, 102 F.3d 204, 210 (6th Cir. 1996) (internal quotation marks and citation omitted). In this case, Officer Duggan witnessed Ms. Harris driving 72 mph in a 55-mph zone, and thus had probable cause to believe that a traffic violation was occurring. *See United States v. Hill*, 195 F.3d 258, 265 (6th Cir. 1999) ("[T]he Tennessee Code prohibits speeding, . . . and Defendants do not dispute the fact that they were traveling in excess of the posted speed limit. Therefore, . . . [the officer] had probable cause to make the initial traffic stop.").

Moreover, Winters does not dispute that Officer Duggan's initial questioning of Ms. Harris and Winters regarding their rental agreement and travel plans while he was preparing the traffic citation was proper.[3] The Supreme Court has stressed that "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). That Officer Duggan also questioned Winters, who was a passenger in the car and not the driver, does not alter the analysis. *See id.* at 328, 332 (considering police questioning of a passenger about gang affiliation, and noting that "a passenger is seized, just as the driver is," during a traffic stop).

## B. Extending the Stop for a Dog Sniff

### 1

"[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). Under the second step of the *Terry* framework, a traffic

---

[2]*See* Appellant Br. at 14 ("When Duggan caught Ms. Harris speeding, he correctly and lawfully pulled her over.").

[3]*See* Appellant Br. at 14–15 ("It was reasonable for Duggan to question Harris and Mr. Winters about the car rental agreement, about their travel plans, and other topics.").

stop "must . . . last no longer than is necessary to effectuate the purpose of the stop," and "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Royer*, 460 U.S. at 500. Once the original purpose of the traffic stop—here, investigating a speeding violation—has been completed, the occupants "cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot." *Hill*, 195 F.3d at 264; *see also Davis*, 430 F.3d at 353 (same).

The Supreme Court has established that the use of a trained narcotics dog during a lawful traffic stop "generally does not implicate legitimate privacy interests." *Caballes*, 543 U.S. at 409. Therefore, because Officer Duggan's use of his narcotics dog does not in itself raise Fourth Amendment concerns, Winters can only prevail by "show[ing] that the officer no longer had reason to keep him where he was" in order to conduct the dog sniff. *United States v. Campbell*, 511 F. App'x 424, 427 (6th Cir. 2013). As a result, the main argument between the parties concerns whether Officer Duggan unreasonably extended the lawfully initiated traffic stop.[4]

Upon obtaining Ms. Harris's signature at 12:24 a.m., Officer Duggan completed the warning ticket for speeding. The purpose of the initial stop was therefore complete at this time. *See, e.g.*, *United States v. Stepp*, 680 F.3d 651, 662 (6th Cir. 2012) (initial stop not completed because the officer "had not completed the warning citation . . . at the time the drugs were discovered"). We note that had Officer Duggan or his backup conducted the drug sniff *before* finalizing the ticket (and without unreasonably prolonging the stop), *Caballes* instructs us that the dog sniff would be of no constitutional significance. *See* 543 U.S. at 406, 409 (use of a

---

[4]Before the magistrate judge, Winters argued that the purpose of the stop was completed at 12:17 a.m., by which time Officer Duggan had completed most of the warning ticket and had "addressed" the speeding violation. At this point, Officer Duggan informed Ms. Harris that he would complete the ticket only after speaking with Winters. Between 12:17 and 12:24 a.m., Officer Duggan questioned Winters and Ms. Harris, and, at 12:24, Officer Duggan completed the citation by obtaining Ms. Harris's signature.

On appeal, however, Winters does not raise Officer Duggan's conduct during this time period, but only challenges Officer Duggan's actions in conducting a dog sniff *after* completing the citation. *See* Appellant Br. at 14 ("Winters respectfully submits that, looking at the totality of the circumstances, Officer Duggan unnecessarily (and, therefore, unreasonably) extended the scope and duration of the traffic stop *in order to conduct a dog-sniff search* without reasonable, articulable suspicion.") (emphasis added). At oral argument, Winters's appellate counsel confirmed that Winters was arguing that the allegedly unconstitutional delay was from 12:24 to 12:28 a.m., after the ticket was signed and before the dog was deployed. Oral Argument at 4:42, *United States v. Winters*, No. 13-6349 (6th Cir. argued Dec. 3, 2014). We need not address, therefore, the finding below that "Officer Duggan did not unreasonably [prolong] the not-yet-completed stop by engaging Defendant in further conversation from 12:17 a.m. until 12:22 a.m. when he returns to Ms. Harris to complete the warning ticket, which was finally signed at 12:24 a.m." *United States v. Winters*, No. 1:12-CR-102, 2013 WL 1498075, at *7 (E.D. Tenn. Jan. 22, 2013).

narcotics dog on the exterior of a lawfully seized car, while the police were "in the process of writing a warning ticket," "does not rise to the level of a constitutionally cognizable infringement"). In this case, by contrast, Officer Duggan extended an already-completed stop by four minutes to conduct a dog sniff *after* the ticket was finished.

The brief duration of this extension does provide support for the government's argument that Officer Duggan's actions were reasonable under the circumstances, as do the facts that the narcotics dog was already present on the scene and his deployment was delayed only for safety reasons until backup arrived. However, given circuit precedent suggesting that "even de minimis" extensions of a *completed* stop are "unreasonable" absent further justification, *Stepp*, 680 F.3d at 661–62, and in light of the Supreme Court's grant of certiorari in a case, discussed further below, presenting the question whether "an officer may extend [an] already-completed stop for a canine sniff without reasonable suspicion or other lawful justification," Question Presented in *Rodriguez v. United States*, No. 13-9972 (cert. granted Oct. 2, 2014), we do not rest our ultimate holding on these grounds.

Instead, we assume that the "*Terry* clock" was reset when the initial purpose of the stop was completed and, as a result, the further detention of Ms. Harris and Winters must have been supported by an independent reasonable and articulable suspicion that criminal activity was afoot. *Johnson*, 482 F. App'x at 143-44; *see also Hill*, 195 F.3d at 264. We therefore proceed to a reasonable-suspicion analysis.

2

Whether an officer has reasonable, articulable suspicion of criminal activity "is based on the totality of the circumstances presented to the officer." *United States v. Jones*, 673 F.3d 497, 502 (6th Cir. 2012). This is an objective standard premised on "specific facts" that "would lead a reasonable officer to suspect illicit activity." *Johnson*, 482 F. App'x at 143. Although the subjective beliefs of the officer are irrelevant, law-enforcement officials are "permitted to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Shank*, 543 F.3d 309, 315 (6th Cir. 2008) (internal quotation marks and citation

omitted).   Ill-defined hunches, however, are not sufficient to establish a reasonable suspicion. *Ibid.*

The factors proffered by the government in its attempt to articulate reasonable suspicion include that:

> (1) Ms. Harris and [Winters] were traveling out of their way by coming from Atlanta through Chattanooga to Memphis on the way to Chicago in a 24-hour rental period; (2) conflicting information was provided by Ms. Harris and [Winters] about when Ms. Harris would be returning to Atlanta and how long they would be staying in Memphis; (3) neither occupant of the car was listed on the car rental agreement as an authorized driver; (4) [Winters] handed the entire vehicle registration paperwork to Officer Duggan instead of just the rental contract; (5) Ms. Harris and [Winters] acted more nervous than the usual motorist facing a traffic violation, including that Ms. Harris engaged in a wide range of emotion while Officer Duggan talked to [Winters] and [Winters] engaged in excessive talking; (6) [Winters] and Ms. Harris did not initially bring up that they were traveling on to Chicago; (7) Ms. Harris's behavior changed when she denied having any [illegal] packages in the car; (8) [Winters] hung up his phone mid-sentence upon Officer Duggan's approach to speak with him; and (9) Ms. Harris addressed her apologies for speeding to [Winters], not to Officer Duggan.

Appellee Br. at 9.   In her analysis, the magistrate judge focused on three general categories that incorporated many of the specific factors listed above: 1) Ms. Harris's and Winters's nervousness; 2) their bizarre and inconsistent explanations of their travel plans; and 3) the fact that neither occupant was an authorized driver of the rental car.   Although finding reasonable suspicion under the totality of the circumstances, the magistrate judge recognized that such factors, when viewed individually, have been given only little or moderate weight by this court.

First, "although nervousness has been considered in finding reasonable suspicion in conjunction with other factors, it is an unreliable indicator, especially in the context of a traffic stop." *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004) (internal citation omitted); *see also Stepp*, 680 F.3d at 665 (noting that this court has found nervousness to be an unreliable indicator "on numerous occasions"); *United States v. Bell*, 555 F.3d 535, 540 (6th Cir. 2009) (factors such as "seeming nervous . . . have previously [been] given little weight"); *United States v. Urrieta*, 520 F.3d 569, 577 (6th Cir. 2008) ("[T]his court has found nervousness inherently *unsuspicious*, and has therefore given it very limited or no weight in the reasonable-suspicion calculation.").   This is based on the recognition that "[m]any citizens become nervous during a

traffic stop, even when they have nothing to hide or fear." *Richardson*, 385 F.3d at 630–31. Indeed, by focusing on indications of nervousness that are "relatively commonplace behaviors," such as engaging in a wide range of emotion, talking excessively, apologizing to a passenger for being pulled over, pacing back and forth, or trembling while handing over a license to the police, "a court risks impaling the defendant on Morton's Fork." *Johnson*, 482 F. App'x at 145.[5]

We therefore accord Officer Duggan's observations of Ms. Harris's and Winters's nervousness little weight, and even then only "in conjunction with other factors." *Richardson*, 385 F.3d at 630; *see also United States v. Wilson*, 506 F.3d 488, 495–96 (6th Cir. 1995) ("Although there are a plethora of cases referring to a defendant appearing nervous, nervousness is generally included as one of several grounds for finding reasonable suspicion and not a ground sufficient in and of itself.") (citation omitted). That Ms. Harris's behavior changed when Officer Duggan asked her about packages in the car does generate some reasonable concern, *cf. Stepp*, 680 F.3d at 666 (mentioning a "noticeable change" in the occupant's behavior when asked "relatively basic follow-up questions" by the officer), but this too is not necessarily suspicious.

Second, conflicting or implausible explanations of travel plans have been accorded some weight by this court in certain cases. *See Townsend*, 305 F.3d at 543 ("[W]e have repeatedly recognized that lying about travel plans can form the basis for reasonable suspicion."). Here, Ms. Harris and Winters had inconsistent explanations of the duration of their stay in Memphis and of Ms. Harris's return to Atlanta, and were making a significant detour to Memphis on their way from Atlanta to Chicago in a car rented for less than 24 hours. Of course, there are potentially innocent explanations for such oddities, but we have "placed weight on implausible travel plans in considering whether reasonable suspicion has arisen." *Stepp*, 680 F.3d at 666.

---

[5]Morton's Fork refers to:

> [Archbishop of Canterbury, Cardinal, and Minister of Henry VII] John Morton's (supposed) method of levying forced loans by arguing that those who were obviously rich could afford to pay, and those who lived frugally must have amassed savings. . . . Hence in extended and allusive use [it is]: a practical dilemma, [especially] one in which both of the choices or alternatives available disadvantage or discredit the chooser.

*Johnson*, 482 F. App'x at 145 n.14 (quoting OXFORD ENGLISH DICTIONARY (Online Ed., March 2012)).

For example, in *Stepp*, we found it "indicative of criminal activity under the facts of [that] case" that a vehicle's occupants did not know the name or location of their destination—a gym—even though they were less than an hour away from it. *Id.* at 666–67. In *Hill*, we determined that the detained occupants' "implausible explanation" for their cross-country journey reasonably aroused the officer's suspicions when combined with "inconsistent stories regarding their travel itinerary" and other factors. *Hill*, 195 F.3d at 272. Indeed, similar to the instant case, we considered it relevant that the driver and passenger in *Hill* differed in their explanations of how long they would remain at their destination. *Ibid.*; *see also United States v. Manjate*, 327 F. App'x 562, 565–56 (6th Cir. 2009) (relevant factor that the defendant "gave information to [the officer] regarding his destination that was inconsistent with common sense"); *United States v. Walton*, 258 F. App'x 753, 758 (6th Cir. 2007) (relevant factor that the "defendant and his passenger gave conflicting explanations of their travel plans," where the defendant-driver said they were going to a fashion show in New York and then a sister's wedding in Philadelphia, and the passenger said they were going to New York for a different wedding); *United States v. Johnson*, 58 F.3d 356, 358 (8th Cir. 1995) (noting "inconsistent explanation[s]" of the occupants' travel).

Ms. Harris's and Winters's "allegedly conflicting explanations of their travel plans" here were, in fact, "mutually exclusive," *Richardson*, 385 F.3d at 631, at least regarding the duration of their trip and Ms. Harris's flight plans. Thus, this is a not a case where differing explanations of travel plans were seemingly inconsistent but in fact reconcilable, *see, e.g., ibid.* ("entirely plausible that the group traveled both to see a doctor," as claimed by the driver, "and a lawyer," as claimed by the passenger); *United States v. Bonilla*, 357 F. App'x 693, 699 (6th Cir. 2009) ("plausible" that the occupants could "accomplish both stated objectives" of visiting friends and going on vacation); *United States v. Smith*, 263 F.3d 571, 592 (6th Cir. 2001) (purported discrepancy in travel plans not a factor where "[t]here was nothing inherently implausible" about them), or suspect only because of an inchoate hunch. *Cf. Townsend*, 305 F.3d at 543-44 (plans involving late-night travel between large cities known for drug-trafficking not "inherently suspicious" absent "indicia of . . . untruthfulness").

Third, we have described "an oddity in a rental-car contract" as a "legitimate consideratio[n] in the reasonable-suspicion analysis." *Johnson*, 482 F. App'x at 146. In *United States v. Branch*, for example, we included as a factor supporting reasonable suspicion that the defendants were driving a rental car that was several weeks overdue. 537 F.3d 582, 588 (6th Cir. 2008). In *United States v. Randall*, we noted "the suspicious nature" of the "rental arrangement" whereby the defendant was driving a car rented by a friend, and in return had rented a car for the friend to drive. 62 F. App'x 96, 101 (6th Cir. 2003).

In the instant case, the rental car was obtained by a third party. We have stressed that drug couriers "may commonly drive other people's rental cars, [using] so called 'third-party rentals.'" *Stepp*, 680 F.3d at 666. Furthermore, neither Ms. Harris nor Winters was listed as an authorized driver in the rental agreement. Although this might be "noticeably less suspicious when the owner or renter is present in the vehicle," *ibid.*, the renter here—Robin Winters—was not a passenger in the car at all. *Cf. Smith*, 263 F.3d at 592 (although not suspicious in that case, the fact that neither occupant "was listed on the rental agreement as an authorized driver . . . may be a critical factor" under some circumstances). That neither Ms. Harris nor Winters was on the rental agreement is entitled to some weight, especially in light of their bizarre plans for using the car during the brief rental period. *See United States v. Garrido-Santana*, 360 F.3d 565, 575 (6th Cir. 2004) (finding reasonable suspicion based on factors including that an "unusually nervous" defendant not clearly listed as an additional driver was driving a car rented by his cousin, taking a "circuitous and impractical" route, and traveling to New York the day before the car was due to be returned in Houston).

3

This is a close case, as the indicators cited by the government do not strongly suggest illicit activity. Indeed, under somewhat similar circumstances in *Johnson*, we determined that the very same Officer Duggan did not have reasonable suspicion based on the defendant-motorist's nervousness, criminal history, and lack of luggage; the presence of industrial-strength degreaser; and the fact that the rental car was not authorized for operation in the state in which the defendant was driving. 482 F. App'x at 145. *But see Hill*, 195 F.3d at 272 (implausible explanation for trip, inconsistent explanation of itinerary, presence of used Kleenex, and

nervousness furnished reasonable suspicion of drug activity).　While certain factors in *Johnson* were clearly of little weight, such as the lack of luggage, others, like the defendant's prior history of crime, could be stronger than some of the factors cited here.　*But cf. Johnson*, 482 F. App'x at 148 ("[T]he fact that [the defendant] had committed crimes in the *past*, while it has a place in the reasonable-suspicion analysis, is not, without more, strong evidence of criminal activity in the *present*.").　On the other hand, the oddity with the rental car in *Johnson*—i.e., that the defendant was authorized to operate the vehicle only in Georgia and Florida, but was pulled over in Tennessee on the way to Kentucky, *id.* at 139—is seemingly less significant than the suspicious rental agreement here, where neither occupant was authorized to operate the vehicle at all. Ultimately, as *Johnson* itself stresses, because "the concept of reasonable suspicion is somewhat abstract," *United States v. Arvizu*, 534 U.S. 266, 274 (2002), "one determination will seldom be a useful precedent for another" and "our reasonable-suspicion cases do not offer a coherent principle that resolves the question we face." *Johnson*, 482 F. App'x at 147 (internal quotation marks and citation omitted).　However, in close cases such as this, we have consistently stressed that we must "review the evidence 'in the light most likely to support the district court's decision.'" *United States v. Braggs*, 23 F.3d 1047, 1049 (6th Cir. 1994) (quoting *United States v. Gomez*, 846 F.2d 557, 560 (9th Cir. 1988)); *see also United States v. Stubblefield*, 682 F.3d 502, 505 (6th Cir. 2012); *United States v. Smith*, 549 F.3d 355, 359 (6th Cir. 2008).

The Supreme Court has warned against engaging in a "divide-and-conquer analysis" that examines the factors supporting reasonable suspicion "in isolation from each other." *Arvizu*, 534 U.S. at 274.　Thus, under the proper totality-of-the-circumstances approach, "we must determine whether the individual factors, *taken as a whole*, give rise to reasonable suspicion, *even if each individual factor is entirely consistent with innocent behavior when examined separately*." *Smith*, 263 F.3d at 588 (emphases added); *see also United States v. Marxen*, 410 F.3d 326, 329 (6th Cir. 2005) ("In considering all the circumstances, the question is not whether there is a possible innocent explanation for each of the factors, but whether all of them taken together give rise to reasonable suspicion that criminal activity may be afoot.").　Here, we conclude that Officer Duggan had reasonable suspicion to detain Winters for the dog sniff based on Ms. Harris's and Winters's nervousness, inconsistent and implausible travel plans, and odd rental arrangement, considered in the aggregate.　*Cf. Campbell*, 511 F. App'x at 428 (finding that the

same officer had reasonable suspicion based on "visible signs of nervousness beyond what Officer Duggan was accustomed to seeing during traffic stops," the defendant's history of drug-trafficking and prior charges, and strong smell of air freshener). This information, when considered in light of Officer Duggan's "experience," "specialized training," and ability "to make inferences from and deductions about the cumulative information . . . that might well elude an untrained person," *Shank*, 543 F.3d at 315 (internal citation omitted), supports a finding of reasonable suspicion that Ms. Harris and Winters were trafficking contraband, which proved to be the case. *Cf. United States v. Garrido*, 467 F.3d 971, 983 (6th Cir. 2006) ("[T]he officers were entitled to judge [the defendant's] behavior and the information obtained during the safety inspection against the backdrop of their own experience and knowledge . . . .").

Winters's appellate counsel argued that Officer Duggan's actions were unreasonable in part because after he became suspicious of the occupants' travel plans and rental agreement, he choose not to further explore those lines of inquiry—by, for example, contacting Winters's cousin who had rented the car or the rental agency—and instead conducted a dog sniff looking for contraband. *See* Appellant Br. at 16 ("Even when Winter[s] had offered to have their travel plans confirmed by a relative, Officer Duggan had refused . . . , conducting no further investigation or inquiry about the rental agreement or the occupants' travel plans."). Thus, the argument goes, because Officer Duggan's suspicions were aroused *by the travel arrangements*, he was entitled to investigate only facts related to those arrangements. *See* Oral Argument at 12:40, 14:10, *United States v. Winters*, No. 13-6349 (6th Cir. argued Dec. 3, 2014) ("[T]he officer is supposed to pursue those facts that come out, not other facts. . . . [The facts regarding the travel arrangements established grounds for further investigation] of *those* facts.") (emphasis added). This contention goes too far.

First, regarding the suggestion that Officer Duggan should have accepted Winters's invitation to speak with his cousin, we note that it is not the role of this court to dictate the precise methods of investigation to be pursued by police officers.[6] Indeed, "[a] creative judge

---

[6]Winters's argument makes apparent the dangers that would arise if this court were to dictate the exact methods an officer must follow when attempting to dispel suspicions that might arise during a detention. It is obvious why a reasonable officer might have been reluctant to accept Winters's offer to speak by phone with his cousin to "confirm" Winters's version of events. The officer would have no means of verifying the identity of the person he might be speaking to, nor would he have any reason to doubt that Winters arranged for a confederate to vouch for him with the police. In any event, there is no indication that attempting to speak with Winters's cousin or

engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished," but this would require us to "indulge in unrealistic second-guessing." *United States v. Sharpe*, 470 U.S. 675, 686–87 (1985); *see also United States v. Sokolow*, 490 U.S. 1, 11 (1989) (In the reasonable-suspicion context, courts should avoid making "rule[s that] would unduly hamper the police's ability to make swift, on-the-spot decisions . . . ."); *Hill*, 195 F.3d at 270 (refusing to adopt a position that would require the court to "draw a bright line limitation as to an officer's course and conduct during a stop"). Rather, we are concerned with ensuring that the investigation was justified and reasonable under the circumstances in its scope and duration. *See Terry*, 392 U.S. at 20.

More fundamentally, Winters's argument relies on the premise that the reasonable suspicion furnished by the inconsistent travel plans and rental agreement only justified further investigation specifically tailored to those exact issues. For this reason, Winters's counsel felt comfortable in all but accepting at oral argument that Officer Duggan *had* reasonable suspicion with regard to the travel arrangements and arguing that deploying the drug dog was simply not justified by that suspicion.[7] This is an improperly narrow understanding of the reasonable-suspicion analysis in this case. Our holding that Officer Duggan had reasonable suspicion under the circumstances reflects the conclusion that a reasonable officer in his situation was presented with sufficient facts to give rise to *suspicion of illicit activity such as trafficking contraband*, which justified a reasonable investigation to uncover that activity. This is to be judged by an objective standard that does not depend on the subjective beliefs of the officer on the scene. Indeed, "[i]f the facts known to the officer support reasonable suspicion" of illicit activity, "it does not matter that the officer was motivated by a belief that a different offense (even one for

---

the rental agency regarding the suspicious travel arrangements—at midnight, no less—would have taken any less time than conducting a dog sniff of the vehicle, which, as *Caballes* establishes, reveals only the possession of contraband. Indeed, encouraging police to employ particular investigatory tactics as Winters suggests might result in further *prolongation* of traffic stops.

[7]*See* Oral Argument at 10:26, 11:38, 12:40, 14:10, *Winters*, No. 13-6349 ("[W]hen facts arose that objectively . . . caused [Officer Duggan] to have reasonable suspicion, he did not pursue that line of inquiry [regarding the travel arrangements]. . . . [W]hen facts arise . . . that cause an officer to have questions, he may reasonably pursue that line of inquiry. That is not what happened here. He here did not look at their travel plans, he did not look at their rental contract, he went and got his drug dog, and that's the problem. . . . [T]he officer is supposed to pursue those facts that come out, not other facts. . . . [The facts regarding the travel arrangements established grounds for further investigation] of *those* facts.") (emphasis added).

which there was not reasonable suspicion) had been committed." *Johnson*, 482 F. App'x at 143 (quoting *United States v. Haskins*, 430 F. App'x 727, 728–29 (10th Cir. 2011)).

Here, as in *Branch*, 537 F.3d 582, *Randall*, 62 F. App'x 96, and *Garrido-Santana*, 360 F.3d 565, for example, Winters's nervousness and bizarre travel arrangements were salient not because they suggested that he was committing rental fraud, but because they would lead a reasonable officer under the circumstances to believe that Winters was *engaged in criminal activity such as trafficking contraband*—just as the used Kleenex found in *Hill* was relevant to suspected drug activity, and not littering. *See Hill*, 195 F.3d at 272. Deploying the drug-detection dog, then, was a reasonable means of investigating the suspected illicit activity.

We do not mean to suggest that a finding of reasonable suspicion justifies inquiry into every possible crime or use of every investigatory method. An officer who pulls over and questions an erratic driver whom he reasonably believes to be intoxicated, for example, cannot, on that basis alone, investigate the driver for securities fraud. Rather, as *Terry* makes clear, the officer's investigation must be "reasonably related in scope" to the factual basis underlying the finding of reasonable suspicion, 392 U.S. at 20, which it was in this case. We hold that there was reasonable suspicion to justify the extended detention of Winters and that the dog-sniff inspection was a reasonable means to dispel that suspicion.

## C. Searching the Car After the Dog's Alert

Once his dog alerted to the presence of narcotics, Officer Duggan searched the rental car and discovered a kilogram package of heroin in Winters's bag on the back seat. It is clear that "[a]n alert by a properly trained and reliable drug-detection dog is sufficient to establish probable cause for the presence of a controlled substance." *Stubblefield*, 682 F.3d at 507 (internal quotation marks and citation omitted). Moreover, such probable cause extends to "every part of the vehicle and all containers found therein in which the object of the search could be hidden." *Ibid.* Thus, Officer Duggan's search of the vehicle was proper.

IV

A. *Rodriguez v. United States*

As noted above, the Supreme Court has granted certiorari in *Rodriguez v. United States*, which involves factual circumstances similar to the instant case. In *Rodriguez*, the Eighth Circuit held that a seven- to eight-minute delay between completing a warning ticket and conducting a dog sniff did "not unreasonably prolong the stop." *United States v. Rodriguez*, 741 F.3d 905, 907 (8th Cir.), *cert. granted*, 135 S. Ct. 43 (2014). Because such a delay is considered "a de minimis intrusion" in the Eighth Circuit, the court did not need to address whether the officers had reasonable suspicion to continue the detention after the initial purpose of the stop had been completed. *Id.* at 908. The defendant's petition for certiorari thus framed the question presented as whether "an officer may extend the already-completed stop for a canine sniff *without reasonable suspicion* or other lawful justification." Petition for Writ of Certiorari at i, *Rodriguez*, No. 13-9972 (emphasis added).

Our holding in this case is premised on the conclusion that Officer Duggan had reasonable, articulable suspicion that justified the extended detention after the traffic stop was completed. As a result, a Supreme Court ruling on the Eighth Circuit's approach in *Rodriguez* will not necessarily implicate our decision here. *Cf. id.* at 12–13 (citing, inter alia, this court's conclusion in *Stepp*, 680 F.3d at 661–62, that "any subsequent prolonging, even de minimis, is an unreasonable extension of an otherwise lawful stop" absent reasonable suspicion to establish circuit split). In any event, as discussed below, even if the Supreme Court's decision in *Rodriguez* alters the applicable framework, suppression would still likely not be justified because Officer Duggan would be "entitled to an objective reasonable reliance on existing judicial precedent." *United States v. Holleman*, 743 F.3d 1152, 1159 (8th Cir. 2014).

B. *Florida v. Jardines*

Winters concedes that under *Caballes* and its progeny, a dog sniff, which "*only* reveals the possession of contraband," "does not compromise any legitimate interest in privacy" and thus does not constitute a search under the Fourth Amendment. 543 U.S. at 408–09 (internal quotation marks omitted); *see also United States v. Place*, 462 U.S. 696, 707 (1983) (use of a

drug-detection dog at the airport "did not constitute a 'search' within the meaning of the Fourth Amendment"). Moreover, under the Supreme Court's and this court's jurisprudence, the appropriate standard for the temporary detention during a traffic stop is reasonable suspicion. *See Hill*, 195 F.3d at 264; Appellant Br. at 18 ("'[R]easonable suspicion' is the appropriate legal inquiry in deciding Winters'[s] Fourth Amendment claim."). Nevertheless, Winters argues that the Supreme Court's recent decision in *Florida v. Jardines*, 133 S. Ct. 1409 (2013), alters the analysis such that "a drug-dog search at a traffic stop should properly be scrutinized by the courts under the regular 'probable cause' standard." Appellant Br. at 19. This argument is mistaken.

In *Jardines*, Justice Scalia, writing for a five-justice majority, concluded that the use of "trained police dogs to *investigate the home and its immediate surroundings* is a 'search' within the meaning of the Fourth Amendment." 133 S. Ct. at 1417–18 (emphasis added). The Court's opinion was based on a trespass rationale that contemplated the government's "unlicensed physical intrusion" of the "constitutionally protected area" of the defendant's home. *Id.* at 1415; *see also id.* at 1415–16 (explaining that there is an implied license to approach a home's entry and "wait briefly to be received," but "no customary invitation" to deploy a police dog to explore the area around a home). This rationale is not implicated when law-enforcement officers are "'on public thoroughfares.'" *Id.* at 1415 (quoting *California v. Ciraolo*, 476 U.S. 207, 213 (1986)). Indeed, the opinion consistently stressed the special solicitude accorded to the home, which "is first among equals" under the Fourth Amendment. *Id.* at 1414. Thus, the central holding of *Jardines* does not impact the use of drug-detection dogs during lawful traffic stops. *Cf. id.* at 1426 (Alito, J., dissenting) ("The holding of the Court is based on what the Court sees as a 'physical intrusion of a constitutionally protected area,' . . . [and] it does not apply when a dog alerts while on a public sidewalk or street . . . .").

Winters is correct that the *Jardines* Court "avoided" the government's argument, relying on *Caballes* and *Place*, that "a drug-dog inspection does not implicate citizens' 'reasonable expectation[s] of privacy.'" Appellant Br. at 18. However, the Court did not call into question the continued vitality of those cases. It simply did not need to address the issue because the government's "physical intrusion to explore details of the home" was "enough to establish that a search occurred." *Jardines*, 133 S. Ct. at 1417. Indeed, Justice Scalia, who authored *Jardines*,

also joined the Court's opinion in *Caballes*, which held that "the use of a well-trained narcotics-detection dog . . . during a lawful traffic stop, generally does not implicate legitimate privacy interests." 543 U.S. at 409.[8]

The other courts that have addressed this issue agree that *Jardines* does not call *Caballes* and its progeny into doubt. *See, e.g.*, *United States v. Seybels*, 526 F. App'x 857, 859 n.1 (10th Cir. 2013) ("The recent decision in *Florida v. Jardines . . .* was based on property rights not implicated in the traffic stop context and, hence, did not undermine *Caballes*."); *United States v. Cordero*, 2014 WL 3513181, at *9 (D. Vt. July 14, 2014) ("*Jardines* did not reverse the Court's decisions holding that canine sniffs during traffic stops do not implicate the Fourth Amendment . . . ."); *United States v. Taylor*, 979 F. Supp. 2d 865, 881–82 (S.D. Ind. 2013) ("[N]othing in *Jardines* disturbed th[e] well-settled proposition" "that [a] dog sniff [is] not a Fourth Amendment search" if "conducted by law enforcement from an area they have a legal right to be.").

Winters's reliance on *Jardines* fails for the additional reason that "[e]vidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule." *Davis v. United States*, 131 S. Ct. 2419, 2429 (2011). The traffic stop and dog sniff at issue here were conducted on August 9, 2012, more than seven months prior to the Supreme Court's *Jardines* decision. And, to this day, there is no precedent in this circuit suggesting that *Jardines* requires law-enforcement officers to have probable cause before conducting dog sniffs during lawful traffic stops. Thus, "[e]ven assuming *Jardines* casts doubt on previous cases involving" dog sniffs during traffic stops, "suppression of the evidence discovered [by Officer Duggan] would not be appropriate" because he was "entitled to an objective reasonable reliance on existing judicial precedent." *Holleman*, 743 F.3d at 1159; *see also United States v. Thomas*, 726 F.3d 1086, 1093 (9th Cir. 2013) (Under the "'faith-in-caselaw' exception to the exclusionary rule," suppression is not warranted where pre-*Jardines* "authoritative guidance from the Supreme Court allowed the particular actions of" law

---

[8]Winters's reliance on Justice Kagan's concurrence in *Jardines* does not change the outcome. In addition to speaking for only three members of the Court, Justice Kagan's concurrence, which explored a privacy rationale in support of the Court's holding, itself stressed that "[t]he police officers here conducted a search because they used a 'device . . . not in general public use' (a trained drug-detection dog) *to 'explore details of the home.'*" *Florida v. Jardines*, 133 S. Ct. 1409, 1419 (2013) (Kagan, J., concurring) (quoting *Kyllo v. United States*, 533 U.S. 27, 40 (2001)) (emphasis added).

enforcement.) (citations omitted); *United States v. Buford*, 632 F.3d 264, 276–77 (6th Cir. 2011) ("A police officer who reasonably relies on settled circuit precedent that authorizes the search of a vehicle acts in objective good faith," and "the judicially-created exclusionary rule does not apply.").

V

We hold that, under the totality of the circumstances, Officer Duggan developed reasonable suspicion of criminal activity that justified extending the traffic stop after its initial purpose was completed to conduct a dog sniff. Therefore, we AFFIRM the district court's denial of Winters's suppression motion.