# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 6, 2012

No. 11-11167
Cons. w/ No. 11-11183

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

COREY VICTOR ROBERSON,

Defendant-Appellant

Appeals from the United States District Court
for the Northern District of Texas
USDC No. 3:00-CR-385-1 & 3:11-CR-165-1

Before REAVLEY, DENNIS, and CLEMENT, Circuit Judges.

PER CURIAM:[*]

Appellant Corey Victor Roberson challenges his conviction for being a felon in possession of a firearm, arguing that police officers had no reasonable suspicion for the *Terry* stop and frisk that led to the discovery of his firearm. Roberson also challenges the district court's decision to revoke his supervised release, which was made partly because of Roberson's firearm conviction. For the reasons that follow, we AFFIRM.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 11-11167
Cons. w/ No. 11-11183

The *Terry* stop and frisk arose after Roberson boarded a Dallas Area Rapid Transit (DART) train wearing a bandana around his face. The DART train operator observed him boarding and called DART control about the situation. A dispatch call was sent out to DART transit police reporting that there were two black males wearing bandanas, and that patrons were afraid that a robbery was about to take place.

A patrol officer, Fernando Ibarra, responded to the call and arrived to conduct a sweep of the train. During his sweep, he identified Roberson and another black male, both of whom he believed matched the description of the call. He asked Roberson and the other male to leave the train and remain on the DART platform with him. It was later revealed that Roberson and the other male, LaDarrell Brown, did not know each other. Shortly after two back-up officers arrived, Ibarra conducted a patdown search of Roberson, during which he discovered a pistol and ammunition. Roberson was arrested and placed in a DART patrol car. While in the car, Roberson called his sister and mother on his cell phone and made incriminating statements, which were recorded by the patrol car's audio and video equipment.

Roberson was charged with being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). He had formerly been convicted in federal district court of bank robbery and use of a firearm during a crime of violence, and had been under supervised release.

Roberson moved in district court to suppress the gun, ammunition, and cell phone statements on the ground that Officer Ibarra's *Terry* stop and frisk violated the Fourth Amendment, and that therefore the pieces of evidence were fruits of an illegal seizure and search. Following a suppression hearing with witness testimony, the district court denied Roberson's motion. Roberson then

No. 11-11167
Cons. w/ No. 11-11183

waived his right to a jury trial. The district court found Roberson guilty of being a felon in possession of a firearm.

In a subsequent supervised release revocation hearing, the court heard additional testimony from a government witness who testified that Roberson had violated various conditions of his supervised release, including two conditions related directly to his firearm conviction. On this basis, the district court revoked Roberson's supervised release.

Roberson appeals both the firearm conviction and the revocation of supervised release.

## I.

In considering a suppression ruling, we review all findings of fact for clear error and review all questions of law *de novo*. *Ornelas v. United States*, 517 U.S. 690, 699, 116 S. Ct. 1657, 1663 (1996); *United States v. Macias*, 658 F.3d 509, 517 (5th Cir. 2011). Historical facts about events leading up to the search or seizure are reviewed for clear error, while the district court's ultimate conclusion on reasonable suspicion is reviewed *de novo* as a mixed question of law and fact. *United States v. Tompkins*, 130 F.3d 117, 120 (5th Cir. 1997). We view the evidence in the light most favorable to the prevailing party—here the Government—and make all inferences in favor of the denial of the motion to suppress. *United States v. Polk*, 118 F.3d 286, 296 (5th Cir. 1997); *see also Macias*, 658 F.3d at 517.

The salient issue on appeal is whether there was reasonable suspicion for Officer Ibarra's stop and frisk of Roberson, as required by the Fourth Amendment and *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968). Reasonable suspicion is measured in light of the totality of the circumstances and must be supported by particular, articulable, and objective facts. *United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 750 (2002); *United States v. Michelletti*, 13

F.3d 838, 840 (5th Cir. 1994) (en banc).  The officer must have reasonable suspicion that a suspect "has been, is, or is about to be engaged in criminal activity."  *United States v. Vickers*, 540 F.3d 356, 361 (5th Cir. 2008) (citing *United States v. Hensley*, 469 U.S. 221, 227, 105 S. Ct. 675, 679 (1985)).  Whether an officer has reasonable suspicion is based on facts known to the officer at the time of the search or seizure.  *Id.*; *Florida v. J.L.*, 529 U.S. 266, 271, 120 S. Ct. 1375, 1379 (2000).  In the course of a search or seizure, officers are permitted "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'"  *Arvizu*, 534 U.S. at 273, 122 S. Ct. at 750–51 (citation omitted).  In a reasonable suspicion analysis, a court examines "whether the officer's action was justified at its inception" and "whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop."  *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc) (citing *Terry*, 392 U.S. at 19–20, 188 S. Ct. at 1879).

Roberson first argues that Officer Ibarra's stop and frisk were unjustified at the inception because Ibarra improperly relied on the DART dispatch call, which Roberson characterizes as a functionally anonymous tip.  However, the dispatch call here is vastly different from an anonymous 911 call.  Ibarra was a DART police officer, and his authority and responsibility were limited in focus to DART trains and property.  As such, when he received a DART dispatch call regarding a possible robbery on a DART train, his natural expectation was that someone on the train had called.  In any case, at the moment that Ibarra conducted a sweep of the train, there was not yet a Fourth Amendment seizure: the *Terry* stop took place, at the earliest, when Ibarra asked Roberson to leave the train.  By the time Ibarra effected a stop, he had personally observed enough facts to give rise to reasonable suspicion justifying his stop.  Thus, while the call

was a valid basis for Ibarra's arrival on the train, it became largely irrelevant thereafter.

Roberson also seeks to devalue the dispatch call by asserting that it contained no information about any criminal activity. This is simply wrong. The DART dispatch log itself reported "Two BM with Banadana [sic] on[.] Patron feeling like they may be robbed." Officer Ibarra testified that the dispatch call came out as "the patrons on the train were afraid something was about to happen, . . . the train was about to be robbed at the time." This report clearly indicated the criminal activity about which Ibarra should investigate. *See Vickers*, 540 F.3d at 361. Roberson's attempt to devalue the DART dispatch call is unavailing, and the call was a proper basis for Ibarra's arrival on and sweep of the train.

Second, Roberson argues that DART police improperly relied on his race when forming reasonable suspicion. Inasmuch as Roberson seeks to argue that race cannot be used in a reasonable suspicion calculus where it was an improper or unjust basis for a seizure or search (such as in racial profiling cases), he states the obvious. Here, however, race was used only as a way to describe the suspect, and there is no evidence that it was used for any other purpose. Roberson himself acknowledges that race may be used for identification purposes in reasonable suspicion cases.[1] Therefore, race was not an improper basis for Officer Ibarra's *Terry* stop and frisk.

Third, Roberson argues that his attire—that is, the bandana covering his face—was not a legitimate basis for reasonable suspicion. He does not cite any case law holding that attire is an inherently inappropriate factor for a

---

[1] In his initial brief, Roberson states that he "does not argue—and in any event, this Court would not accept the notion—that 'race' and 'attire' are *per se* exempt from a *Terry* calculus. Obviously they have a place in describing a person."

reasonable suspicion calculus.[2]  Roberson's principal contention regarding his attire is that there are reasons other than robbery that he might have been wearing a bandana, namely that it was cold.  During the suppression hearing, Roberson presented evidence that a cold front had developed in Dallas that evening, and that at the time he boarded the DART train, the temperature was possibly 40 degrees Fahrenheit with wind chill, and that the inside temperature of the train was roughly similar.  On the other hand, the train conductor and Officer Ibarra testified that it was not that cold on the train and that the train had a heater.  The Government also presented video evidence that while some officers were wearing jackets on the scene, others were wearing short sleeves.  This conflicting evidence does not clearly support Roberson's portrayal of the events, and thus we defer to the district court's resolution of the facts, since the court was uniquely situated to determine the credibility and reliability of the testimony.  The district court did not clearly err in finding that Roberson was wearing the bandana for reasons unrelated to the weather.

Fourth, Roberson contests the district court's conclusions over four facts related to his and others' behavior: that other passengers were frantic and frightened during Ibarra's sweep and they gestured toward Roberson with their heads and eyes; that Roberson looked straight ahead and did not pay attention to Ibarra when the officer stepped onto Roberson's train car; that Roberson was

---

[2] Indeed, Roberson cites only *United States v. Henry*, 372 F.3d 714, 715–16 (5th Cir. 2004), to argue that "this Court has considered attire as a basis for reasonable suspicion only in conjunction with other affirmative acts suggesting criminality."  Even by Roberson's characterization, *Henry* is not a case only about attire.  In *Henry*, attire constituted only one factor in a litany of factors that served the basis for officers' reasonable suspicion.  Therefore, *Henry* reflects the basic principle that whether or not police have reasonable suspicion to conduct a seizure or search is inherently fact-intensive.  *See United States v. Ibarra-Sanchez*, 199 F.3d 753, 759 (5th Cir. 1999) ("Any analysis of reasonable suspicion is necessarily fact-specific, and factors which by themselves may appear innocent, may in the aggregate rise to the level of reasonable suspicion.").

quiet and cooperative when Ibarra asked him to get off the train, in contrast to Brown who loudly protested; and that Roberson's eyes were scanning back and forth while on the DART platform, as if he were trying to escape. Roberson does not argue that these facts are precluded from a reasonable suspicion calculus, but rather he disagrees with the district court's conclusions regarding what the facts should have suggested to Officer Ibarra at the time. For our purposes, it is enough to emphasize that these behavioral facts are to be construed in favor of the Government. *Polk*, 118 F.3d at 296. Officer Ibarra could reasonably have surmised from other DART passengers' "frantic mode" and gestures that criminal activity was afoot. Further, Ibarra could reasonably have concluded, based on his experience, that Roberson's silence was suspicious, especially at a time when it would have been normal in Ibarra's judgment for a suspect to be vocal. Finally, what Roberson dismisses as a mere "ophthalmological" state could very well have indicated to Ibarra that Roberson was looking for an escape route. Granted, these are not the only explanations for Roberson's behavior, but they are reasonable ones. Once we construe these behavioral facts in favor of the Government, there was clearly a sound basis for Ibarra's *Terry* stop and frisk.

After Officer Ibarra detained Roberson on the DART platform, the DART officers' subsequent actions were "reasonably related in scope to the circumstances that justified the stop." *Brigham*, 382 F.3d at 506. The officers' conduct was generally reasonable, since the entire process from Ibarra's arrival on the train to the discovery of Roberson's firearm took only six minutes, and the DART officers did not draw any weapons or use any force until Roberson's firearm was discovered. More specifically, the officers had reasonable grounds to conduct a *Terry* frisk.

A *Terry* frisk may be conducted where the officer "is justified in believing that the individual whose suspicious behavior he is investigating at close range

is armed and presently dangerous to the officer or to others." *Terry*, 392 U.S. at 24, 88 S. Ct. at 1881. Here, the entire series of events originating with the DART dispatch call gave DART officers reasonable suspicion to believe that Roberson was about to commit a robbery, and thus that he was armed and posed a danger to the officers and the passengers. For example, evidence was submitted that the officers believed Roberson was scanning the DART platform to find an escape, meaning that he also could have attempted to break off and turn a weapon on the officers or on others nearby. Given these facts, it was reasonable for the officers to conduct a *Terry* frisk of Roberson.[3]

In summary, the DART dispatch call, including its reference to Roberson's attire; the behavior of other passengers on the train when Officer Ibarra arrived; and Roberson's behavior when Ibarra approached and interacted with him were all sufficient grounds for reasonable suspicion. Ibarra and the DART police were justified in conducting a *Terry* stop of Roberson, and all their subsequent actions, including Ibarra's *Terry* frisk of Roberson, were reasonably related in scope to the circumstances that justified the stop. Accordingly, there was reasonable suspicion for the stop and frisk, and we therefore affirm the district court's judgment of conviction.

---

[3] Admittedly, there are facts to suggest that once Roberson was detained on the DART platform, he was no longer "presently dangerous." In particular, Roberson was seated, quiet, and boxed in by three police officers. A court should not ignore facts tending to lessen an officer's suspicions that criminal activity is afoot. *Cf. Bigford v. Taylor*, 834 F.2d 1213, 1218 (5th Cir. 1988) ("As a corollary . . . of the rule that the police may rely on the totality of facts available to them in establishing probable cause, they also may not disregard facts tending to dissipate probable cause.") (footnote omitted). However, as emphasized by the district court, nor is an officer required to rule out all possibility of innocent behavior before initiating a *Terry* encounter. None of these facts are incongruent with DART officers' reasonable concern that Roberson posed an imminent danger to them and to others, especially in light of their belief that he was about to commit a robbery.

No. 11-11167
Cons. w/ No. 11-11183

II.

In addition, Roberson appeals the district court's decision to revoke his supervised release. The Government prevails on this appeal for three reasons. First, Roberson makes no argument and provides no citations of law to support this appeal. Second, there is no evidence that the district court placed any special reliance on Roberson's firearm conviction when it revoked his supervised release. On the contrary, the court held a thorough revocation hearing, during which it heard from a government witness who testified that Roberson had violated three mandatory conditions that had nothing to do with his firearm conviction and thus would have been independently sufficient for revocation.[4] Third, the exclusionary rule does not apply to supervised release revocation hearings absent police harassment. *United States v. Montez*, 952 F.2d 854, 857 (5th Cir. 1992). Roberson has not alleged, and there is no evidence of, police harassment. In fact, as has already been discussed, the DART officers' treatment of Roberson was reasonable. Therefore, we affirm the district court's judgment revoking Roberson's supervised release.

AFFIRMED.

---

[4] These three conditions were that "[t]he defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer"; "[t]he defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician"; and "[t]he defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer."