NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 15a0542n.06

Case No. 14-4059

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jul 30, 2015
DEBORAH S. HUNT, Clerk

UNITED STATES OF AMERICA,       )
                                )
    Plaintiff-Appellee,         )
                                )
                                )   ON APPEAL FROM THE UNITED
v.                              )   STATES DISTRICT COURT FOR
                                )   THE NORTHERN DISTRICT OF
ERIK LAMONT THORNTON,           )   OHIO
                                )
    Defendant-Appellant.        )
                                )
                                )   OPINION

BEFORE: BOGGS and DONALD, Circuit Judges; QUIST, District Judge.[*]

**BERNICE BOUIE DONALD, Circuit Judge.**  Defendant-Appellant Erik Lamont Thornton ("Thornton") appeals his conviction and 46-month prison sentence for being a felon in possession of a firearm.  Thornton raises two issues on appeal.  First, he argues that the district court should have suppressed evidence obtained as a result of an illegal stop and frisk by the police.  Second, he argues that the district court erroneously applied a two-level sentencing enhancement for possession of a stolen firearm pursuant to § 2K2.1(b)(4)(A) of the United States Sentencing Guidelines ("U.S.S.G.").  Finding neither argument persuasive, we **AFFIRM** the judgment of the district court in all respects.

---

[*] The Honorable Gordon J. Quist, United States District Judge for the Western District of Michigan, sitting by designation.

I.

A.

On October 23, 2013, Akron Police Department Officers Drew Reed ("Reed") and James Hadbavny ("Hadbavny") were assisting other officers with a traffic stop at the intersection of Copley Road and Seward Avenue in Akron, Ohio. During the traffic stop, Reed and Hadbavny heard a loud gunshot nearby and northeast of their location. The officers returned to their cruiser, made a U-turn, drove eastbound on Copley Road, and made a northbound turn onto Nome Avenue. The officers then rolled the cruiser's windows down and turned off its headlights. As the officers traveled northbound on Nome Avenue, they heard a second, louder gunshot. Reed testified that the second gunshot "sounded almost like it was right beside us, just to the east of us." The officers determined that the gunshots were coming from east of their location, "towards [South] Hawkins Avenue." Hadbavny testified that the source of the gunfire was approximately three houses down on South Hawkins Avenue.

After hearing the second gunshot, the officers continued northbound on Nome Avenue until they reached Orrin Street, on which they made an eastbound turn. The officers then proceeded eastbound to the intersection of Orrin Street and South Hawkins Avenue. When they looked southbound on South Hawkins Avenue, the officers spotted a black male standing in the front yard of the house at 908 South Hawkins Avenue, on the west side of the street. Both officers identified the man as Thornton. The officers did not see anybody else—pedestrian or motorist—on South Hawkins Avenue.

After spotting Thornton, the officers made a southbound turn onto South Hawkins Avenue. Although the cruiser's headlights were off, the car had reflective "Akron Police" markings on its side, which the streetlights and moonlight illuminated. Thornton

looked in the direction of the officers' vehicle, "quickly" walked toward a 2011 Toyota Corolla parked in the driveway, opened the passenger door, threw an object inside, and closed the door. Thornton then "briskly walked away." Both officers testified that they believed Thornton had thrown a gun into the parked vehicle.

When the officers pulled up to Thornton, Hadbavny shined the cruiser's spotlight on him. The officers then exited their vehicle and approached Thornton. Both officers agreed that they had detained Thornton for an investigative stop at the time Hadbavny spotlighted him. Hadbavny asked Thornton what was going on and whether he had heard any gunshots. Hadbavny then patted Thornton down to check for weapons. Both officers testified that Thornton appeared "sweaty and jittery," made quick, nervous motions, and was "visibly shaking." According to Hadbavny, Thornton "wasn't really paying attention" to any of Hadbavny's requests for information—such as name and date of birth—and would not make eye contact.

Once Hadbavny had completed his frisk of Thornton and confirmed that he had no weapons on his person, Reed walked over to the passenger side of the Toyota Corolla and shined a flashlight inside the car. Without opening the door of the vehicle, Reed observed a gun sitting in plain view on the driver's-side seat. Reed then told Hadbavny, who was still questioning Thornton, to place Thornton under arrest. At that point, Thornton bent down as if to adjust his shoe, which both officers testified is a typical maneuver of a person on the verge of attempting to flee. When Thornton bent down, Hadbavny told him to put his hands behind his back. Then, Thornton stood up and lunged into Hadbavny.

Reed attempted to push Thornton onto the trunk of the car, but Thornton spun around and ran into Hadbavny. Hadbavny then tackled Thornton's legs, and Thornton dragged Hadbavny

into the neighboring yard.  After a "pretty long fight," the officers were able to subdue Thornton into a "stalemate" until additional officers responded with assistance.  The officers then placed Thornton in handcuffs and escorted him to the cruiser.

Thornton made several statements while in the back of the police cruiser.  First, Thornton spontaneously shouted to a nearby family member that "[he] took Daddy's gun because [he] wanted to kill [himself]."  Then, in response to questioning about the gunshots, Thornton admitted to Reed that he fired the gun in the backyard of the house at 908 South Hawkins Avenue.  However, the government conceded that this statement was inadmissible because Reed did not read Thornton his *Miranda*[1] rights.  Finally, as Hadbavny sat silently in the front seat of the police cruiser, Thornton struck up a conversation with him.  Specifically, Thornton asked Hadbavny, "So why is my car being towed?"  Hadbavny replied, "It's part of the incident."  Thornton then stated, "Oh, 'cause I threw it in there?"  The officers then transported Thornton back to the police station.  Reed testified that, during the ride, Thornton seemed "cheerful" and apologetic, and that he pointed out for the officers where he lived.[2]

B.

On November 20, 2013, a grand jury in the Northern District of Ohio returned a one-count indictment against Thornton, charging him with being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  The firearm in question was a Sig Sauer, Model P250, 9mm pistol that Thornton obtained by prying open a lockbox in his father's home.  On February 20, 2014, Thornton filed a motion to suppress (1) "all evidence confiscated by the Akron Police Department officers who stopped, seized, and searched Mr. Thornton and his

---

[1] *See Miranda v. Arizona*, 384 U.S. 436 (1966).  At no point during the encounter with Thornton did the officers administer a *Miranda* warning.
[2] The home at 908 South Hawkins Avenue belonged to Thornton's father.

vehicle without reasonable suspicion, without probable cause, and without a search warrant"; and (2) "all statements made by Mr. Thornton to Akron Police Department officers." The district court held a hearing on Thornton's suppression motion on April 1, 2014, at which Reed, Hadbavny, and Thornton all testified.[3]

On April 17, 2014, the district court granted in part and denied in part Thornton's suppression motion. As relevant to this appeal, the court held that the officers had reasonable, articulable suspicion to stop and frisk Thornton, and that, in any event, the gun in Thornton's car was independently admissible under the plain-view doctrine. Accordingly, the court did not suppress "[e]vidence, including the gun, seized as a result of [Thornton's] stop . . . ."

Thornton signed a conditional plea agreement on April 28, 2014, which the district court approved on July 23, 2014. The agreement preserved Thornton's right to appeal the district court's suppression order.

The district court held a sentencing hearing on October 10, 2014. The presentence investigation report ("PSR") recommended a base offense level of 20, a two-level enhancement for possession of a stolen firearm pursuant to U.S.S.G. § 2K2.1(b)(4)(A), and a three-level reduction for acceptance of responsibility. The district court agreed with the PSR's recommendations, finding that Thornton stole the firearm by prying open his father's lockbox to obtain access to it. With a base offense level of 19 and a criminal-history category of IV, Thornton's advisory guidelines range was 46-57 months. The court sentenced Thornton to serve 46 months—the low end of the range. This timely appeal followed.

---

[3] Thornton disputed several portions of the officers' testimony. Most significantly, Thornton testified that Reed unlocked the door of his car and rummaged around inside to find a gun under the seat. However, the district court found Reed's testimony regarding how he found the gun credible.

II.

Thornton argues (1) that the district court's refusal to suppress evidence obtained as a result of the officers' illegal stop and frisk was erroneous and (2) that the district court erroneously applied a stolen-firearm enhancement to his sentence. We address each argument in turn.

A.

Thornton's first contention on appeal is that the district court should have suppressed evidence—including the firearm—obtained as a result of an illegal stop and frisk by the police. The argument fails.

1.

We apply a mixed standard of review to a district court's decision on a motion to suppress, examining "the district court's findings of fact for clear error and its conclusions of law de novo." *United States v. Winters*, 782 F.3d 289, 294-95 (6th Cir. 2015) (quoting *United States v. Johnson*, 656 F.3d 375, 377 (6th Cir. 2011)) (internal quotation marks omitted). Upon review of the denial of a motion to suppress, we must "view the evidence in the light most favorable to the government." *United States v. Lee*, --- F.3d ----, 2015 WL 4254012, at *3 (6th Cir. July 15, 2015). Thus, we must accept the district court's factual findings—including credibility determinations—unless they are "clearly erroneous." *Id.* (citing *United States v. Lyons*, 687 F.3d 754, 762 (6th Cir. 2012)). "[A] denial of a motion to suppress will be affirmed on appeal if the district court's conclusion can be justified for any reason." *United States v. Higgins*, 557 F.3d 381, 389 (6th Cir. 2009) (alteration in original) (quoting *United States v. Hardin*, 539 F.3d 404, 417 (6th Cir. 2008)) (internal quotation marks omitted).

2.

A police officer may conduct a brief investigatory stop of a person, consistent with the Fourth Amendment, if the officer has "a reasonable, articulable suspicion that [the] person may be involved in criminal activity." *Loza v. Mitchell*, 766 F.3d 466, 476 (6th Cir. 2014) (citing *Terry v. Ohio*, 392 U.S. 1, 30-31 (1968)); *see also Arizona v. Johnson*, 555 U.S. 323, 326 (2009) (holding that a *Terry* stop is justified "when [a] police officer reasonably suspects that the person apprehended is committing or has committed a criminal offense"). The stop must be (1) "justified at its inception" and (2) "reasonably related in scope to the circumstances which justified the interference in the first place." *Loza*, 766 F.3d at 476 (quoting *Terry*, 392 U.S. at 20) (internal quotation marks omitted). During such a stop, the police "may make 'reasonable inquiries' of the person and conduct a pat-down search to check for weapons," *id.* (quoting *Terry*, 392 U.S. at 20), as long as the police "reasonably suspect that the person stopped is armed and dangerous." *Johnson*, 555 U.S. at 326-27.

In determining whether the police had reasonable suspicion to conduct an investigatory stop, we employ a totality-of-the-circumstances inquiry. *Hoover v. Walsh*, 682 F.3d 481, 494 (6th Cir. 2012). "Reasonable suspicion requires more than a 'mere hunch,' but 'less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard.'" *Id.* (quoting *United States v. Campbell*, 549 F.3d 364, 370-71 (6th Cir. 2008)). A stop and frisk must be justified by "specific and articulable facts" suggesting that the searched person is engaged in criminal activity. *Id.* (quoting *Smoak v. Hall*, 460 F.3d 768, 778-79 (6th Cir. 2006)) (internal quotation marks omitted). Pertinent factors to consider "include the officer's own direct observations, dispatch information, directions from other officers, and the

nature of the area and time of day during which the suspicious activity occurred." *Id.* (quoting *Campbell*, 549 F.3d at 371) (internal quotation marks omitted).

In this case, the district court cited the following factors in support of its holding that Reed and Hadbavny had reasonable, articulable suspicion to stop Thornton: (1) they observed Thornton as the only person in the vicinity of shots fired moments earlier; (2) the stop took place in a high-crime area; and (3) when Thornton spotted the officers, he quickly walked over to a vehicle parked in the driveway, opened the door, and hurriedly tossed an item inside. Thornton argues that "[t]he individual elements do not arise to reasonable suspicion, and the sum of the parts fails to establish reasonable suspicion." We disagree.

First, we have repeatedly held that a person's proximity to the location of a crime is a relevant factor in a *Terry* analysis.[4] *See, e.g.*, *United States v. Atkins*, 513 F. App'x 577, 580 (6th Cir. 2013) (noting that a person's physical and temporal proximity to the scene of a crime are appropriate factors in the reasonable-suspicion inquiry); *United States v. Johnson*, 246 F. App'x 982, 987 (6th Cir. 2007) (holding that the officers' reasonable suspicion to conduct a *Terry* stop was supported by "the fact that the officers found the defendant at 2:00 a.m., in a high crime neighborhood, in close proximity in time and location to . . . shots-fired allegations"). Here, the officers encountered Thornton (and *only* Thornton) in close proximity to the location that they suspected was the origin of the gunshots—approximately three houses down on South Hawkins Avenue. And the officers heard the gunshots, which Reed testified sounded as if they were "right beside" them, just moments before spotting Thornton. *Cf. United States v. McMullin*, 739 F.3d 943, 947 (6th Cir. 2014) (finding reasonable suspicion where officers "responded to a reported breaking-and-entering at a residence to find [the defendant] standing in

---

[4] It is undisputed that firing a gunshot within the Akron city limits is a criminal violation. *See* Akron Municipal Code § 137.08(a) ("No person shall discharge a cannon, rifle, gun revolver, pistol or other firearm within the city.").

front of the same window that had reportedly attempted to be broken into only a few minutes prior"). Although Thornton impugns the district court's determination that the officers were able to pinpoint the location of the gunshots in a dense neighborhood, there is nothing in the record to suggest that the court committed clear error by finding the officers' testimony credible on this point. *See Lee*, 2015 WL 4254012, at *3. Thus, this factor weighs in favor of reasonable suspicion. *Cf. United States v. Edwards*, 761 F.3d 977, 982 (9th Cir. 2014) (emphasizing that the defendant "was the only person in the vicinity . . . who fairly matched the description of a man who reportedly had been shooting at passing cars just minutes before police arrived"); *United States v. Moore*, 817 F.2d 1105, 1107 (4th Cir. 1987) (holding that the officers' reasonable suspicion to conduct a *Terry* stop was supported by the fact that the defendant "was the only person in the vicinity" of a recently committed crime).

Second, although Thornton is correct that a person's mere presence in a high-crime area "may not, without more, give rise to reasonable suspicion," it is nevertheless "relevant to the reasonable suspicion calculus." *United States v. Caruthers*, 458 F.3d 459, 467 (6th Cir. 2006) (collecting cases). Here, the government produced unrefuted evidence that the area in which the officers encountered Thornton had experienced a significant number of violent crimes over the previous year. Thus, the officers' reasonable suspicion was bolstered not only by the fact that they encountered Thornton in close proximity to recently fired gunshots, but also by credible evidence that they were responding to a "specific, circumscribed location[ ] where [violent] crimes occur with unusual regularity." *Id.* at 468 (quoting *United States v. Montero-Camargo*, 208 F.3d 1122, 1138 (9th Cir. 2000) (en banc)).

Finally, before the officers turned on their cruiser's spotlight, Thornton quickly walked over to a car parked in the driveway, opened the passenger door, and tossed an object inside. He

then "briskly" walked away. Thornton argues that this conduct is just as easily attributable to innocent conduct as it is to criminal activity. While this may be true, we have recently stressed that our review of the denial of a motion to suppress should not resemble "a 'divide-and-conquer analysis' that examines the factors supporting reasonable suspicion 'in isolation from each other.'" *Winters*, 782 F.3d at 301 (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)). Rather, "we must determine whether the individual factors, *taken as a whole*, give rise to reasonable suspicion, *even if each individual factor is entirely consistent with innocent behavior when examined separately*." *Id.* (quoting *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001)) (internal quotation marks omitted). In this case, the officers heard a nearby gunshot, encountered Thornton (and *only* Thornton) moments later in the vicinity of the area they believed was the source of the gunshot, and saw Thornton quickly dispose of an item in a parked car after spotting the officers' cruiser. These "[f]urtive movements made in response to a police presence" are yet another relevant factor that may "properly contribute to an officer's suspicions." *Caruthers*, 458 F.3d at 466 (collecting cases).

In sum, we hold that the officers had reasonable, articulable suspicion to stop and frisk Thornton based on his geographic and temporal proximity to recently fired gunshots, the fact that he was the only person in the area, and his furtive movements in response to noticing the officers' squad car. Viewing the evidence, as we must, "in the light most likely to support the district court's decision," *Winters*, 782 F.3d at 301 (quoting *United States v. Braggs*, 23 F.3d 1047, 1049 (6th Cir. 1994)) (internal quotation marks omitted), this conclusion inexorably follows. Accordingly the district court's refusal to suppress evidence obtained as a result of the police's stop and frisk of Thornton was not erroneous.[5]

---

[5] Because we hold that the officers' stop and frisk was justified, we need not delve into the parties' alternative arguments regarding the admissibility of the firearm under the plain-view doctrine.

B.

Next, Thornton argues that the district court erroneously applied a two-level enhancement to his base offense level for possession of a stolen firearm pursuant to U.S.S.G. § 2K2.1(b)(4)(A). Specifically, Thornton argues that he could not "steal" a gun over which he had "constructive possession"—i.e., that because the gun was stored in his parents' home and he "knew the gun was present and within his immediate control," he constructively possessed it and could not steal it. This argument also fails.

1.

"We review the district court's legal interpretation of the Guidelines de novo, but accept factual findings made by the district court at sentencing unless they are clearly erroneous." *United States v. Pirosko*, 787 F.3d 358, 372 (6th Cir. 2015) (citation omitted) (quoting *United States v. Phillips*, 516 F.3d 479, 483 (6th Cir. 2008)) (internal quotation marks omitted). We must "give due deference to the district court's application of the Guidelines to the facts." *United States v. Galaviz*, 645 F.3d 347, 358 (6th Cir. 2011) (quoting *United States v. Moon*, 513 F.3d 527, 539-40 (6th Cir. 2008)) (internal quotation marks omitted). The government bears the burden of establishing by a preponderance of the evidence that a sentencing enhancement applies. *United States v. Byrd*, 689 F.3d 636, 640 (6th Cir. 2012).

2.

Section 2K2.1(b)(4)(A) of the Sentencing Guidelines permits a district court to enhance a defendant's base offense level by two levels "[i]f any firearm . . . was stolen . . . ." Although the Guidelines do not define the word "stolen," for purposes of § 2K2.1(b)(4)(A), we have interpreted the word to mean, "'[t]o take dishonestly or secretly.'" *United States v. Jackson*, 401 F.3d 747, 750 (6th Cir. 2005) (quoting the Oxford English Dictionary). An intent to

permanently deprive a person of property is not required in order to conclude that property is "stolen" for purposes of the stolen-firearm enhancement. *Id.*

In this case, the PSR recommended a two-level stolen-firearm enhancement because Thornton "stole the firearm from his father by prying open his father's gun box." Thornton objected, as he does now, on the basis that "he had constructive possession of the firearm located in his house, and [could not] steal something within his own possession." The objection is creative insofar as it has not appeared with any regularity in case law.[6] In overruling the objection, however, the district court stated:

> The constructive possession argument fails. The gun was not in the constructive possession of Mr. Thornton. In fact, it was locked away in a place that was hoped to be a situation that would have prevented anyone from opening it without certain tools and permission to do so. Mr. Thornton didn't have permission to open that box. He did that without his dad's permission. That's been clear. And he was not in constructive possession of that firearm.

The district court's analysis was correct. "A weapon is 'constructively' possessed if . . . the defendant 'knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." *United States v. Walker*, 734 F.3d 451, 455 (6th Cir. 2013) (quoting *United States v. Craven*, 478 F.2d 1329, 1333 (6th Cir. 1973)). There must be evidence that the defendant "had knowledge of, access to, and an intent to exercise control over the gun." *United States v. Bailey*, 553 F.3d 940, 946 (6th Cir. 2009). Here, the uncontroverted record evidence indicates that Thornton's father had deliberately cut off all *access* to the gun by securing it in a lockbox. Thornton then *stole* the gun by prying open his father's lockbox. In that vein, Thornton's conduct is exactly analogous to the conduct of other defendants for which we have upheld stolen-firearm enhancements. *E.g.*, *Jackson*, 401 F.3d at

---

[6] In *United States v. Pazour*, 609 F.3d 950, 952-53 (8th Cir. 2010) (per curiam), the Eighth Circuit encountered an argument by *the government* that a defendant constructively possessed a stolen firearm for purposes of a § 2K2.1(b)(4)(A) enhancement. However, on plain-error review, the court avoided deciding the question directly. *Id.* at 953-54.

748, 750 (upholding application of the stolen-firearm enhancement to a defendant who had taken his father's gun "without permission"). There is no dispute that Thornton "deprived [his father] of possession of the gun without his consent." *United States v. Herrman*, No. 96-3076, 1996 WL 621028, at *1 (10th Cir. Oct. 28, 1996), *cited with approval in Jackson*, 401 F.3d at 750. That factual circumstance also distinguishes Thornton's case from the other cases involving constructive possession, in all of which there was no impediment to the defendant's access to a gun and in none of which there were affirmative acts such as prying open an intentionally locked gun box. *See United States v. Guadarrama*, 591 F. App'x 347, 355 (6th Cir. 2014) (finding that a defendant constructively possessed a shotgun located in the closet of a locked room to which the defendant had access and in which he stored some of his personal items); *United States v. Braswell*, 516 F. App'x 572, 573, 575 (6th Cir. 2013) (finding that a defendant constructively possessed a handgun that he knew was located "in the house" and that officers found "under the cushion of a chair in the living room"); *United States v. Morrison*, 594 F.3d 543, 545-46 (6th Cir. 2010) (finding the evidence sufficient to support a felon-in-possession charge where the firearm in question was in plain view of the defendant and "probably was rubbing his side"); *United States v. Kincaide*, 145 F.3d 771, 776, 782 (6th Cir. 1998) (finding the evidence sufficient to support a felon-in-possession charge where officers located the firearms in question strewn loosely throughout a shared apartment—"adjacent to [a] couch; . . . in plain view on the floor of the kitchen; . . . in a living room closet; . . . [and] in a bedroom closet").

Put simply, Thornton did not have access to his father's gun, absent engaging in conduct tantamount to taking it "dishonestly or secretly." *Jackson*, 401 F.3d at 750 (internal quotation marks omitted). Mindful that "the sentencing guidelines require[ ] a broad meaning of 'stolen'

for firearm charges," *United States v. Tyerman*, 701 F.3d 552, 565 (8th Cir. 2012), we uphold the

district court's determination that Thornton did not constructively possess the firearm.

III.

For the foregoing reasons, we **AFFIRM** the judgment of the district court in all respects.