**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 15a0588n.06

**No. 14-2537**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| | ) | Aug 18, 2015 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| JOHN CHAMBERS, | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

BEFORE:   BOGGS and DONALD, Circuit Judges; and QUIST, District Judge.[*]

BOGGS, Circuit Judge.   Police officers encountered Defendant-Appellant John Chambers along with a man who was wearing a bandana over his face near the scene of a reported shooting moments after the shooting occurred. The officers stopped the two men at gunpoint and, in response to the officers' inquiries, Chambers stated that he was carrying a gun. The officers then frisked Chambers and discovered a loaded handgun that Chambers had taken from his girlfriend without her consent. Chambers was thereafter convicted of being a felon in possession of a firearm.

Chambers appeals from the district court's denial of his motion to suppress the firearm evidence. He also challenges the application of a sentencing enhancement for possessing a stolen firearm. We hold that, in light of the fluid and potentially dangerous circumstances presented, the officers had reasonable, articulable suspicion of criminal activity that justified

---

[*] The Honorable Gordon J. Quist, United States District Judge for the Western District of Michigan, sitting by designation.

their stop and frisk of Chambers. We also hold that the district court properly applied the sentencing enhancement because Chambers deprived the owner of the firearm in question of possession without her consent. We therefore affirm the denial of Chambers's motion to suppress and affirm the district court's sentence.

I

Around 6:50 p.m. on January 9, 2013, emergency personnel in Flint, Michigan received a 911 call stating that someone had been shot at the Evergreen Regency Apartments. *United States v. Chambers*, No. 13-20254, 2014 WL 1365691, at *1 (E.D. Mich. Apr. 7, 2014). Within a few minutes, Michigan State Police Trooper Derek Hoffman and Michigan State Police Sergeant Brian Reece responded to the broadcast from dispatch and arrived at the Regency Apartments.[1] They immediately observed two men walking away from the complex near its entrance. One of the men, Sean Collins, was wearing a bandana over his face.[2] The other man was Defendant-Appellant John Chambers.

The officers drew their weapons and ordered the two men to stop. Sergeant Reece asked the men if they were armed, and Chambers responded that he had a gun in his coat pocket. Sergeant Reece then frisked Chambers and recovered a loaded .40-caliber handgun, an additional magazine, and a holster. He then placed Chambers under arrest. The handgun belonged to Chambers's girlfriend; Chambers had taken it from her that evening without permission.

---

[1] The record suggests that the officers arrived at the scene between one and three minutes after receiving the broadcast from dispatch.

[2] There is some dispute in the record over whether the facial covering at issue was a bandana—as described by the officers—or a camouflage hunter's mask—as claimed by Collins. Because we perceive no relevant differences under the circumstances between the two articles of clothing, which each would mask a substantial portion of a person's face, we need not resolve the dispute.

On April 3, 2013, Chambers, who previously had been convicted of two felony offenses, was charged with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Chambers filed a motion to suppress the firearm evidence, arguing that the officers lacked reasonable suspicion for the search and seizure that produced the firearm. After holding an evidentiary hearing, the district court denied the motion on April 7, 2014. The parties then proceeded to a jury trial where, at the close of the evidence, Chambers renewed his suppression motion. The district court again denied the motion, and Chambers was convicted as charged.

At sentencing, the district court determined the applicable United States Sentencing Guidelines range to be 18–24 months of imprisonment. This range included a two-level enhancement under USSG § 2K2.1(b)(4)(A) for possessing a stolen firearm. Ultimately, the district court sentenced Chambers to 21 months of imprisonment. Chambers timely appealed the denial of his suppression motion and the application of the sentencing enhancement.

II

Chambers first argues that the district court improperly denied his motion to suppress the firearm evidence. Specifically, Chambers maintains that the arresting officers lacked the reasonable, articulable suspicion necessary to justify their search and seizure of him.

A

We review a district court's decision on a motion to suppress under a mixed standard of review. *United States v. Winters*, 782 F.3d 289, 294 (6th Cir. 2015). Under this approach, "we review the district court's findings of fact for clear error and its conclusions of law de novo." *United States v. Johnson*, 656 F.3d 375, 377 (6th Cir. 2011). Where, as here, the district court has denied the motion, "we consider the evidence in the light most favorable to the government." *United States v. Rose*, 714 F.3d 362, 366 (6th Cir. 2013).

B

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons . . . ." U.S. Const. amend. IV. A law-enforcement officer's stop and frisk of a suspect— though potentially brief in duration—demonstrably infringes upon the suspect's liberty and thus constitutes a search and seizure for Fourth Amendment purposes. *See Terry v. Ohio*, 392 U.S. 1, 16 (1968) ("[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person. And . . . a careful exploration of the outer surfaces of a person's clothing all over his or her body in an attempt to find weapons is . . . a 'search.'"). An officer may conduct a stop and frisk consistent with the Constitution "if two conditions are met." *Arizona v. Johnson*, 555 U.S. 323, 326 (2009). First, the investigatory stop must be lawful at its inception—i.e., justified by the requisite level of suspicion. *Ibid.* Second, before conducting a frisk, "the police officer must reasonably suspect that the person stopped is armed and dangerous." *Ibid.*

Because the officers only frisked Chambers after he admitted to having a firearm, thus providing reason to believe that he was armed and dangerous, our focus is on the first requirement—i.e., whether the police had reasonable suspicion to stop Chambers.[3]

1

The requirement that an investigatory stop be lawful at its inception is satisfied "in an on-the-street encounter . . . when the police officer reasonably suspects that the person apprehended

---

[3] The district court addressed the constitutionality of the resulting frisk despite Chambers's failure to directly challenge that issue in his suppression motion. *See Chambers*, 2014 WL 1365691, at *9 (citing *United States v. McMullin*, 739 F.3d 943, 945 (6th Cir. 2014), for the proposition that "counsel's failure to clearly distinguish between the constitutionality of the stop and constitutionality of the frisk will not prohibit this Court from analyzing the 'frisk' issue presented"). Chambers raises no arguments on appeal that would call into question the district court's determination that, assuming the initial stop was justified, the resulting frisk comported with the Fourth Amendment.

is committing or has committed a criminal offense." *Johnson*, 555 U.S. at 326 (citing *Terry*, 392 U.S. 1). Whether an officer has reasonable suspicion of criminal activity is judged by the totality of the circumstances. *See, e.g.*, *United States v. Galaviz*, 645 F.3d 347, 353 (6th Cir. 2011). Pertinent factors in the reasonable-suspicion analysis "include the officer's own direct observations, dispatch information, directions from other officers, and the nature of the area and time of day during which the suspicious activity occurred." *United States v. Campbell*, 549 F.3d 364, 371 (6th Cir. 2008).

In holding that the officers here had reasonable, articulable suspicion to stop Chambers, the district court relied on the following factors: the officers observed Chambers and Collins walking together in close proximity to the reported scene of a shooting mere minutes after the shooting occurred; Collins was wearing a mask at the time, which, in the officers' experience, may be associated with the commission of a crime; and Chambers and Collins were the only two people in the area. *Chambers*, 2014 WL 1365691, at *8.[4]

---

[4] The parties dispute the extent to which we should rely on the observations and report of another officer, Genesee County Sheriff's Deputy Daniel Miller. Under the so-called "collective knowledge" or "fellow officer" rule, police officers may develop the reasonable suspicion necessary to effect a search or seizure based on information obtained and relayed by fellow officers. *United States v. Lyons*, 687 F.3d 754, 766 (6th Cir. 2012). Relevant here, both Sergeant Reece and Trooper Hoffman testified at the evidentiary hearing that, after receiving the call from dispatch regarding the shooting and mere seconds before arriving at the Regency Apartments, they heard a report over the radio from Deputy Miller that he had observed two men—one of whom was masked—walking near the entrance to the complex. In his own testimony, however, Deputy Miller did not recall specifically making that report—though he noted that doing so "wouldn't be something uncommon for [him] to do"—and no recordings from the relevant time were available. Moreover, at trial, Chambers introduced 911 dispatch chronologies indicating that Deputy Miller arrived at the scene two minutes *after* Sergeant Reece and Trooper Hoffman encountered Chambers and Collins. In response, the government noted that such chronologies are not necessarily accurate to the minute, especially in quickly unfolding situations involving officers from multiple jurisdictions, and that the chronologies reflected the time of Officer Miller's report of his arrival at the actual scene of the shooting, rather than the specific time that he observed Chambers and Collins.

2

Individually, none of the factors cited by the district court strongly suggests criminal activity by Chambers or Collins. However, we must be careful to consider "whether the individual factors, *taken as a whole*, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately." *United States v. Perez*, 440 F.3d 363, 371 (6th Cir. 2006) (emphasis added); *see also United States v. Marxen*, 410 F.3d 326, 329 (6th Cir. 2005) ("In considering all the circumstances, the question is not whether there is a possible innocent explanation for each of the factors, but whether all of them taken together give rise to reasonable suspicion that criminal activity may be afoot."). In this respect, we must be mindful of the particular exigencies presented to the officers, who must make decisions to safeguard their own and the public's safety under the fog of rapidly developing situations and without the luxury of complete information. Moreover, "in close cases such as this, we have consistently stressed that we must 'review the evidence in the light most

---

In any event, we need not wade too deeply into this dispute. The government never asserted that Officer Miller provided a suspect description specifically identifying Chambers or connecting him to criminal activity. Rather, the only information allegedly provided in Deputy Miller's report—"that he observed two individuals walking away near the scene of the shooting, one of whom had a bandana covering his face," Appellee Br. 14—was also obtained independently by Sergeant Reece and Trooper Hoffman when they arrived at the complex seconds later and observed Chambers and Collins themselves. Thus, even if we ignore the information allegedly provided by Deputy Miller, the reasonable-suspicion calculus remains (essentially) the same: Sergeant Reece and Trooper Hoffman independently responded to the dispatch regarding a shooting in a high-crime area, observed Chambers and Collins—and *only* Chambers and Collins—in close proximity to the scene mere moments after the call, and noticed that Collins was wearing a mask at the time.

That Sergeant Reece's and Trooper Hoffman's testimony at the suppression hearing relied in part on Deputy Miller's alleged report does not alter our analysis. The reasonable-suspicion determination is based upon an "objective standard that does not depend on the subjective beliefs of the officer[s] on the scene," but rather on the actual facts known to the officers. *Winters*, 782 F.3d at 303.

likely to support the district court's decision.'" *Winters*, 782 F.3d at 301 (quoting *United States v. Braggs*, 23 F.3d 1047, 1049 (6th Cir. 1994)).

a

Chambers correctly observes that mere presence in an area associated with criminal activity "may not, without more, give rise to reasonable suspicion." *United States v. Caruthers*, 458 F.3d 459, 467 (6th Cir. 2006); *see also Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."). Nevertheless, presence in "an area of expected criminal activity" is "among the relevant contextual considerations in a *Terry* analysis." *Wardlow*, 528 U.S. at 124. In this case, moreover, the officers' suspicions were aroused not simply because they happened upon Chambers and Collins in an area with a historical reputation for criminal activity, but rather because they discovered the two men outside the very apartment complex in which a shooting was reported only minutes earlier (and which also happened to be a high-crime area).

We have observed repeatedly that a suspect's presence near the location of a reported crime can be a salient factor giving rise to reasonable suspicion. *See, e.g.*, *United States v. Thornton*, No. 14-4059, 2015 WL 4567780, at *4 (6th Cir. July 30, 2015) (collecting cases); *United States v. Atkins*, 513 F. App'x 577, 580 (6th Cir.), *cert. denied*, 133 S. Ct. 2784 (2013) (finding reasonable suspicion in part based on the defendant's "temporal and physical proximity to the reported crime"); *Galaviz*, 645 F.3d at 354 n.5 (initially finding reasonable suspicion based in part on the location of the suspect's car and the time of his encounter with the police relative to the time of the reported crime). In this case, the fact that the officers encountered Chambers and Collins "in close proximity in time and location to the . . . shots-fired allegations"

contributed to the officers' suspicions that the men might have been involved in a shooting. *United States v. Johnson*, 246 F. App'x 982, 987 (6th Cir. 2007).

Moreover, the temporal proximity between the reported shooting and the officers' arrival at the scene—around one to three minutes—contributed to their perception of a potential risk to their well-being and the need to approach Chambers and Collins with extreme caution. *See* Transcript of Evidentiary Hearing ("Hearing") at 13, *United States v. Chambers*, No. 13-20254 (E.D. Mich. Dec. 10, 2013) (officer testified that "[i]t was an officer's safety situation meaning that [there] was a high potential [for a] life-threatening or life-endangering situation [as] there was a shooting just recently, we were in the area and we had two subjects in the area at that time that potentially could be armed"); *cf. Houston v. Clark Cnty. Sheriff Deputy John Does 1-5*, 174 F.3d 809, 814–15 (6th Cir. 1999) ("[W]hen police officers reasonably fear that suspects are armed and dangerous, they may . . . draw their weapons" and take "steps [that] are 'reasonably necessary for the protection of the officers.'") (quoting *United States v. Garza*, 10 F.3d 1241, 1246 (6th Cir. 1993)).  This remains true even if the belief that the two men may have been involved in a shooting proved incorrect. *Cf. Brinegar v. United States*, 338 U.S. 160, 176 (1949) ("[L]ong-prevailing standards" in the Fourth Amendment context "seek to give fair leeway for enforcing the law in the community's protection.  Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part.").

This case closely parallels the circumstances in *United States v. McMullin*, 739 F.3d 943 (6th Cir. 2014).  In *McMullin*, officers arrived at the scene of a reported breaking-and-entering of a home within ten minutes of receiving a radio communication from dispatch.  The officers, who did not have a specific description of any suspects, encountered McMullin close to the front of

the home. "Concerned for their safety and believing that McMullin might be a suspect in the breaking and entering, the officers immediately frisked McMullin to ensure that he did not have any weapons." *Id.* at 944. The officers discovered a .38-caliber revolver in McMullin's waistband.

The officers later determined that McMullin had not been involved with the reported breaking-and-entering but, like Chambers, he was charged with being a felon in possession of a firearm under § 922(g)(1). In affirming the denial of McMullin's motion to suppress, we determined that "the officers had a particularized and objective basis for suspecting McMullin of the reported criminal activity" because they encountered him "standing in front of the same window that had reportedly attempted to be broken into only a few minutes prior." *Id.* at 947. We also approved of the officers' "almost immediat[e]" frisk of McMullin in light of the nature of the suspected crime and "the officers' reasonable fear for their own or others' safety." *Ibid.*; *see also id.* at 946–47 (quoting *United States v. Snow*, 656 F.3d 498, 503 (7th Cir. 2011), for the proposition that "[b]ecause burglary is the type of offense that likely involves a weapon, [the officer's] decision to [conduct] a protective frisk was reasonable despite the absence of additional facts suggesting that [this suspect] in particular might be armed"). This analysis applies with equal force here.

Chambers warns us that his mere proximity to the area of the shooting "would apply to anyone who was in the Regency Apartment complex that night" and therefore is "an all-encompassing fact . . . insufficient to provide a specific, articulable basis of criminal activity." Appellee Br. 21. It is not simply the case, however, that the officers encountered Chambers and Collins near a reported crime scene. Rather, the officers encountered *only* Chambers and Collins, who was *wearing a mask* at the time, walking *in close proximity to* the scene of a

reported shooting in a high-crime area *a few minutes after* the shooting occurred. *See Thornton*, 2015 WL 4567780, at *4–5 (finding reasonable suspicion after stressing that "the officers encountered [the defendant] (and *only* [the defendant]) in close proximity to the location that they suspected was the origin of the gunshots . . . [only] moments later").

When examining these circumstances, we must refrain from "engaging in a 'divide-and-conquer analysis' that examines the factors supporting reasonable suspicion 'in isolation from each other.'" *Winters*, 782 F.3d at 301 (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)). Thus, in light of the rapidly developing and potentially dangerous nature of the situation, it was reasonable under the circumstances for the officers to detain Chambers and Collins briefly and inquire as to whether they were armed. *See, e.g.*, *United States v. Vickers*, 540 F.3d 356, 362 (5th Cir. 2008) (upholding stop and frisk of a suspect encountered near the scene of a reported burglary in light of the officer's perception that "burglary suspects are often armed" and "safety required a pat-down"); *cf. United States v. Sokolow*, 490 U.S. 1, 11 (1989) (In the Fourth Amendment context, courts should avoid making "rule[s that] would unduly hamper the police's ability to make swift, on-the-spot decisions.").[5]

---

[5] This case is distinguishable from *United States v. Johnson*, 620 F.3d 685 (6th Cir. 2010), which Chambers cites in arguing that "the fact that there was a 911 call reporting a crime and [Chambers] was walking near the area of shooting [is] insufficient to provide a particularized and objective basis to suspect [Chambers] of any wrongdoing." Appellant Br. 24. In *Johnson*, officers responded to a 911 call from an area associated with drug trafficking "asserting that 'some people' connected with a blue Cadillac were 'walking around' outside the caller's apartment." 620 F.3d at 687. The *Johnson* court stressed that this vague 911 call "provided insufficient reason to believe that [the defendant], even if he was one of the 'people' [the caller] had called about, had committed, was committing, or was about to commit a crime." *Id.* at 693. The 911 call, which suggested—at best—"a limited, unspecified possibility of criminal activity," *id.* at 693–94, thus did not reasonably arouse suspicion of crime or fear for officer safety.

In contrast, the officers here were responding to a report of a specific (and violent) crime that occurred in the very recent past. The *Johnson* court itself distinguished cases like this one that "involved a report that a specific crime had taken place." *Id.* at 693 n.6.

b

For similar reasons, our analysis is not undermined by Chambers's observation that covering one's face is normally an innocent behavior—especially during a Flint, Michigan winter.[6] When viewed in conjunction with the time and location factors discussed above, the fact that the officers encountered a masked individual mere moments after arriving at an active crime scene reasonably contributed to their suspicions in this case. Persuasive precedent supports this understanding.

In *United States v. Roberson*, for example, the Fifth Circuit found reasonable suspicion to justify a stop and frisk of a suspect in part because the suspect was wearing a bandana over his face. 496 F. App'x 390, 393 (5th Cir. 2012). The defendant in *Roberson* argued that his attire "was not a legitimate basis for reasonable suspicion" because there were "reasons other than robbery that he might have been wearing a bandana, namely that it was cold." *Ibid.*[7] After observing that there was no precedent "holding that attire is an inherently inappropriate factor for a reasonable suspicion calculus," the Fifth Circuit deferred to the district court's determination that the defendant "was wearing the bandana for reasons unrelated to the weather." *Id.* at 393–94; *see also United States v. Spoerke*, 568 F.3d 1236, 1249 (11th Cir. 2009) (finding reasonable suspicion of illicit activity based on the officer's "observation of gloves, goggles, a face mask,

---

[6] The temperature in Flint at 6:50 p.m. on January 9, 2013, was around 39°F with a wind-chill of 29.6°F. *See Weather History for KFNT on Wednesday, January 9, 2013*, Weather Underground, http://www.wunderground.com/history/airport/KFNT/2013/1/9/DailyHistory.html?req_city=Flin t&req_state=MI&req_statename=Michigan&reqdb.zip=48507&reqdb.magic=1&reqdb.wmo=99 999 (last visited August 17, 2015). This is well above the average historical mean temperature of 23°F for that date. *Ibid.* However, 39° (with a 29.6° wind-chill) certainly may be brisk enough to justify covering one's face—especially in light of an average wind speed that evening of 18.4 mph with gusts to 28.8 mph. *Ibid.*

[7] The defendant in *Roberson* presented evidence that a cold front had moved into Dallas on the date in question, reducing the wind-chill temperature to around 40°F. 496 F. App'x at 393.

and a flashlight in plain view"); *United States v. Chapman*, 954 F.2d 1352, 1357 (7th Cir. 1992) ("[T]he observation of a holster and a ski mask—in July—would certainly justify experienced officers in concluding that" the suspects "were involved in [a] reported bank robbery."). We similarly defer to the district court's decision here to credit the officers' testimony that wearing a mask "may be associated with the commission of a crime." *Chambers*, 2014 WL 1365691, at *8; *see also* Hearing at 10–11, 41 (officers testified that, in their experience, wearing a bandana or mask over the face in the relevant neighborhood is "more associated with concealing [one's] identity in relation to . . . committing a crime" than with staying warm).

In sum, we conclude that Chambers's temporal and physical proximity to the scene of a reported shooting and his presence with an individual wearing a mask over his face provided reasonable suspicion for his brief detention by the police. We reach this conclusion in view of the specific exigencies presented to the officers, including their perception of a potential threat to public safety and their own well-being, and our obligation to "review the evidence in the light most likely to support the district court's decision." *Winters*, 782 F.3d at 301 (internal quotation marks omitted).

## III

Chambers next argues that the district court improperly applied a two-level sentencing enhancement under USSG § 2K2.1(b)(4)(A) for possessing a stolen firearm. Specifically, Chambers asserts that there was no evidence that the gun he possessed was "stolen."

## A

We review the district court's legal conclusions regarding the Sentencing Guidelines de novo. *United States v. Moon*, 513 F.3d 527, 540 (6th Cir. 2008). We "'accept the findings of fact of the district court unless they are clearly erroneous and . . . give due deference to the

district court's application of the Guidelines to the facts.'" *Id.* at 539–40 (quoting *United States v. Williams*, 355 F.3d 893, 897–98 (6th Cir. 2003)). It is the government's burden to prove that an enhancement applies by a preponderance of the evidence. *United States v. Dunham*, 295 F.3d 605, 609 (6th Cir. 2002).

B

USSG § 2K2.1(b)(4)(A) provides that a two-level sentencing enhancement should be applied to an offense involving the possession of a firearm if the firearm "was stolen." In *United States v. Jackson*, this court established that the meaning of "stolen" in that section comports with "the Oxford English Dictionary's definition of 'steal,' as 'To take dishonestly or secretly.'" 401 F.3d 747, 750 (6th Cir. 2005). The defendant in *Jackson* had taken a gun that belonged to his father "without permission" and with the intent to use it to commit suicide. *Id.* at 748. Because the defendant "assumed the gun would eventually be returned to his father," he argued that "it was not 'stolen'" for the purposes of the Guidelines. *Ibid.* Relying on persuasive precedent from other circuits, however, we determined that the applicable definition of "stolen," in contrast to the common-law definition of larceny, does not require "the intent to permanently deprive the owner" of the firearm "of his property." *Ibid.*; *see also United States v. Herrman*, No. 96-3076, 1996 WL 621028, at *1 (10th Cir. Oct. 28, 1996) ("We are persuaded the gun was stolen within the meaning of section 2K2.1(b)(4)" when the owner "was deprived of possession of the gun without his consent.").

In this case, the presentence report prepared by the United States Probation Office stated that Chambers's girlfriend, who was the lawful owner of the firearm at issue, kept the gun "locked up" and that Chambers "took the gun without her permission." Chambers did not object to this statement. *See* Fed. R. Crim. P. 32(i)(3)(A) ("At sentencing, the court . . . may accept any

undisputed portion of the presentence report as a finding of fact."). At trial, moreover, both of the arresting officers testified that Chambers apologized to his girlfriend, who approached Chambers after he was placed into custody, for taking her gun on the night of the arrest. Indeed, Chambers's own sentencing memorandum states that, although Chambers's girlfriend "did not feel that Chambers had 'stolen' [the gun] and she did not report it stolen," she "did not know he would take the gun" on the night in question.

There is no indication in the record that Chambers received his girlfriend's consent— whether explicit or implicit—to take the gun, and thus the only evidence before us suggests that Chambers "did not have access to [the] gun, absent engaging in conduct tantamount to taking it dishonestly or secretly." *Thornton*, 2015 WL 4567780, at *7. Because the record suggests that Chambers's girlfriend "was deprived of possession of the gun without [her] consent," *Herrman*, 1996 WL 621028, at *1, and in light of the binding authority of *Jackson*, we defer to the district court's application of the enhancement in this case. *Cf. United States v. Bates*, 584 F.3d 1105, 1109 (8th Cir. 2009) (recognizing that a "broad definition of 'stolen' is consistent with the guideline's purpose[s]" and finding that the enhancement was properly applied where a defendant found a gun that was "lost or mislaid" by its owner who "never authorized anyone to take the gun, never sold it, and never gave it away as a gift").

## IV

For the foregoing reasons, we AFFIRM the denial of Chambers's motion to suppress and AFFIRM the district court's sentence.