

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

NOS. PD-0013-15 & PD-0015-15

**THE STATE OF TEXAS**

**v.**

**MICHAEL ERIC RENDON, Appellee**

ON STATE'S PETITION FOR DISCRETIONARY REVIEW
FROM THE THIRTEENTH COURT OF APPEALS
VICTORIA COUNTY

YEARY, J., filed a dissenting opinion in which KELLER, P.J., and KEASLER and HERVEY, JJ., joined.

## DISSENTING OPINION

In *Florida v. Jardines*, 133 S.Ct. 1409 (2013), the United States Supreme Court held that a narcotics-dog sniff conducted on the front porch of a private residence constituted a search for Fourth Amendment purposes. In a published opinion, the Thirteenth Court of Appeals applied that holding to conclude that the trial court properly granted Appellee's motion to suppress in this case, in which the police conducted a dog sniff for drugs at the front door of Appellee's apartment. *State v. Rendon*, ___ S.W.3d ___, Nos. 13-13-00665-CR

& 13-13-00666-CR, 2014 WL 6881630 (Tex. App.—Corpus Christi Feb. 4, 2015). The court of appeals agreed with the trial court that the short walkway leading exclusively from the top of an outdoor staircase to Appellee's front door constituted "curtilage" within the meaning of the Fourth Amendment.[1] I would reverse the judgment of the court of appeals. Because the Court does not, I dissent.

## BACKGROUND

Victoria narcotics detective Jason Stover was investigating Appellee on suspicion that he had been involved in the sale of cocaine to a confidential informant. Stover had been informed that Appellee was the scheduled driver of a business vehicle from which the sale had been conducted. On May 8, 2012, he proceeded with "Canine Baco," his trained drug-detection dog, to Appellee's residence at 901 Bingham, Apartment C. Baco first alerted to the presence of cocaine in the business vehicle, which was located in the parking lot of the apartment complex. Stover next led Baco to Appellee's apartment door. Stover described the layout as follows: "The apartment complex is a four-plex, two on the bottom, two on the top. The top have a common -- one common staircase, up the middle, and splits off on a balcony, either left or right." Apartment C was the only apartment located to the left from the top of the staircase; there was no additional apartment farther down the walkway. Access to the doors of all the apartments was open to the public, with no "No Trespassing" signs posted. Testimony and photographs admitted at the hearing on Appellee's motion to suppress

---

[1] *Id*. at *4 ("[W]e hold that police conducted an unreasonable search by using a trained police dog to investigate the curtilage of [Appellee's] apartment.").

indicated that some of the residents of the complex kept patio furniture or plants along the walkway right outside their apartment doors, but Appellee himself did not.

Within "[a] couple of seconds" of climbing the stairs and arriving at the door of Apartment C along with Stover, Baco alerted to the presence of narcotics. Stover subsequently obtained a search warrant for the apartment. Based upon what this search revealed, Appellee was charged with possession of marijuana in an amount between four ounces and five pounds; he was also charged with money laundering.[2]

The trial court granted Appellee's motion to suppress. In its written order granting the motion to suppress, the trial court concluded that the dog sniff constituted an illegal search because it was conducted without a warrant while Stover and his narcotics dog were physically intruding upon the curtilage of Appellee's apartment.[3] For this proposition, the trial court relied upon the opinion of the First Court of Appeals in *McClintock v. State*, 405 S.W.3d 277 (Tex. App.—Houston [1st Dist.] 2013).[4] Excluding the information gleaned from

---

[2] As the court of appeals observed, "The record is unclear as to what exactly was seized from [Appellee's] . . . apartment following the execution of the search warrant." 2014 WL 6881630, at *1.

[3] The trial court's order stated: "The landing to the left of the top of the stairs led only and directly to defendant's door, [and] was therefore part of the 'curtilage' of defendant's apartment and not part of a 'public or common area.' * * * Therefore, [the narcotic dog's] 'alert' was an illegal search within the meaning of the Fourth Amendment pursuant to Florida v. Jardines, 133 S.Ct. 1409 (2013)."

[4] McClintock lived in "a two-story brick duplex" in Houston. 405 S.W.3d at 281. The bottom story housed certain business premises and the top story was McClintock's apartment. *Id*. A stairway around the back of the building led up to what was apparently a single-unit dwelling—*not* a multi-dwelling complex. *Id*. The court of appeals determined that the landing at the top of the stairway constituted

the drug-dog's sniff from Stover's affidavit in support of the warrant to search Appellee's apartment, the trial court found insufficient probable cause to justify issuance of the search warrant, and therefore concluded that any evidence obtained from the search was tainted.[5] The court of appeals agreed with the trial court's conclusion, reasoning that "[t]he present case does not deal with the common areas of an apartment complex . . . such as parking lots and sidewalks, but rather the curtilage of [Appellee's] apartment." *State v. Rendon*, 2014 WL 6881630, at *4. We granted the State's petition for discretionary review to examine this holding.[6]

---

part of the apartment's curtilage. No different than a porch, the stairway landing attached to and surrounded the entrance to McClintock's home and the activity of home life extended onto it. McClintock kept several house plants on the landing. The stairway was not a 'common' area; it led only and directly to McClintock's door.

*Id*. at 284. This Court granted discretionary review in *McClintock*, but the scope of our review did not extend to the question of whether the top of the landing leading into the apartment constituted "curtilage" for purposes of the Fourth Amendment. *McClintock v. State*, 444 S.W.3d 15, 16 (Tex. Crim. App. 2014). The Court has no occasion today to express an opinion with respect to whether the particular facts of *McClintock* would demonstrate curtilage.

[5] The trial court's order stated: "The 'drug dog alerting at the front door of the defendant's apartment' is then excluded from consideration in the search warrant affidavit. Considering the remaining information in the search warrant affidavit, the remaining information does not establish probable cause to search the defendant's apartment."

[6] In *Rivas v. State*, 411 S.W.3d 920 (Tex. Crim. App. 2013), we remanded the case to the court of appeals for reconsideration of the question of whether a dog sniff conducted at the appellant's front door constituted a search in contemplation of the United States Supreme Court's then-recent opinion in *Jardines*. We did not indicate in our remand opinion whether the appellant's home was a house that he owned or an apartment that he rented. But even assuming that *Rivas* involved an apartment door, such a summary remand does not constitute a definitive resolution of the question for which the case is remanded, and *Rivas* does not control our disposition today. Were it otherwise, there would have been no point in our having granted the State's petition for discretionary review in this case, as we did in February of 2015—sixteen months after *Rivas*.

**STANDARD OF REVIEW**

A reviewing court defers to the historical fact-findings and credibility determinations of the trial court, so long as those determinations find support in the record. *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008). But there is no factual dispute in this case. Nor is there any mixed question of law and fact that turns on the credibility of a witness. The facts are uncontested and the only issue is the legal significance of those facts. Under these circumstances, I will review the question of whether the undisputed facts show that Detective Stover and Baco invaded the curtilage of Appellee's apartment—a mixed question of law and fact—*de novo. See Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010) (reviewing courts review mixed questions of law and fact *de novo* unless they turn on an evaluation of credibility or demeanor); *State v. Sheppard*, 271 S.W.3d 281, 291 (Tex. Crim. App. 2008) (whether particular facts satisfy ultimate legal standards "are legal conclusions subject to *de novo* review, not deference"); *Garcia-Cantu*, 253 S.W.3d at 241 ("[T]he question of whether a given set of historical facts amount[s] to a consensual police-citizen encounter or a detention under the Fourth Amendment is subject to *de novo* review because that is an issue of law—the application of legal principles to a specific set of facts.").

The facts of the instant case establish that Baco alerted to the presence of drugs from a position just outside the threshold of Appellee's apartment door. The door was not located in an enclosed hallway but was exposed to the out-of-doors for anyone to see. On the other hand, from the top of the stairs, the landing to the left led only to Appellee's door, not to any

other apartment. Although some of the apartments in the complex had patio furniture and plants situated in the areas immediately surrounding their respective front doors, Appellee's did not. These facts are uncontested. I am left to decide the legal significance of these undisputed facts.

Was Stover encroaching upon the curtilage of Appellee's apartment at the time that Baco detected the presence of drugs, as the court of appeals concluded? If so, then the drug sniff constituted a warrantless search, the fruit of which should not have been considered by the magistrate who issued the subsequent warrant to search Appellee's apartment. If not, it is still necessary to decide whether the dog sniff nonetheless constituted a search—on the theory that Appellee's apartment is his "house" for Fourth Amendment purposes, and "[w]hen it comes to the Fourth Amendment, the home is first among equals." *Jardines*, 133 S.Ct. at 1414. I shall begin my analysis of this question with an examination of the concept of "curtilage" before *Jardines* was decided, and then I shall turn to *Jardines* itself to determine whether it has changed that concept. Finally, I ask whether there may have been a search in this case even in the absence of a physical invasion of the curtilage.

**ANALYSIS**

**Was the Curtilage Invaded?**

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches . . . shall not be violated[.]" U.S. CONST. amend. IV. "At the very core" of "the personal rights" that the

Fourth Amendment "secures . . . stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511 (1961). Because the sanctity of the home "would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity[,]" the Fourth Amendment protection afforded to a person in his home extends also to "what [Supreme Court] cases call the curtilage[.]" *Jardines*, 133 S.Ct. at 1414. "[T]he curtilage is the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life . . . and therefore has been considered part of the home itself for Fourth Amendment purposes." *Oliver v. United States*, 466 U.S. 170, 180 (1984) (internal quotation marks omitted). Courts "have defined the curtilage, as did the common law, by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private." *Id*.

"While the boundaries of the curtilage are generally 'clearly marked,' the 'conception defining the curtilage' is at any rate familiar enough that it is 'easily understood from our daily experience.'" *Jardines*, 133 S.Ct. at 1415 (quoting *Oliver*, 466 U.S. at 182 n.12). In *United States v. Dunn*, 480 U.S. 294, 301 (1987), the Supreme Court gleaned four general factors from its own cases and lower court case law that it deemed "useful," though not exclusive, to "the task of defining the extent of a home's curtilage[.]" These factors are:

> the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

*Id*. These factors were deemed "useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id*. Stated another way, "the primary focus is whether the area in question harbors those intimate activities associated with domestic life and the privacies of the home." *Id.*, n.4.

It is, of course, beyond dispute that a residential apartment deserves protection as a "house" under the Fourth Amendment. *See Clinton v. Virginia*, 377 U.S. 158 (1964) (summarily reversing the opinion of the Supreme Court of Appeals of Virginia in *Clinton v. Commonwealth*, 204 Va. 275, 282, 130 S.E.2d 437, 442 (1963), which had held that a listening device "stuck in" a party wall between two residential apartments did not constitute a Fourth Amendment violation). And there is likewise no doubt that an apartment—even an apartment in a multi-dwelling complex such as the one in this case—may carry with it a certain extent of curtilage, such as a partially enclosed patio, balcony, or patch of yard that is not open to use by other residents. The question here is whether the area immediately surrounding the front door of Appellee's apartment is sufficiently tied to the inherent privacy and intimate activities of the home as to merit the same Fourth Amendment sanctity as a home.

Whether a particular apartment threshold may be regarded as curtilage will depend, of course, upon application of the *Dunn* factors to the facts of the case to determine the

degree to which the intimate activities of the home are implicated. By and large, however, courts have fairly uniformly held that when the front door to an apartment or other "multi-occupancy dwelling" is exposed to general view rather than enclosed, and/or secured, from public access, the area around the front door does not enjoy the status of protected curtilage. *See* 1 Wayne R. LaFave, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 2.3(c), at 759, 761-62 (5th ed. 2012) ("[W]hat is different about the multiple-occupancy dwelling cases generally is that an occupant can claim an exclusive privacy interest in only a portion of the premises, and areas immediately adjacent to that portion will be open to public or common usage, so that courts are inclined to view those occupying such dwellings as having a reduced privacy expectation. * * * Apartment dwellers fare no better. It is not a search for an officer to look into an apartment while in a common passageway or other common area of the apartment complex[.]"); Carole A. Chase, *Cops, Canines, and Curtilage: What* Jardines *Teaches and What it Leaves Unanswered*, 52 HOUS. L.REV. 1289, 1305 (Spring 2015) ("In summary, the overwhelming weight of authority rejects the proposition that a resident of a multi-dwelling residential building can claim curtilage protection in common areas—or even anywhere outside an individual unit."). The more difficult cases involve apartment thresholds that open up into an enclosed hallway that is accessible to other residents and their guests but not necessarily to the public at large. Even then, a majority of courts have held that the area immediately around the front door does not constitute curtilage—even when the common hallway is secured by lock and key from entry by the

general public. *E.g.*, *State v. Talley*, 307 S.W.3d 723, 732 (Tenn. 2010) (identifying as the emerging "majority position among the states which have considered the question" that apartment and condominium dwellers have no reasonable expectation of privacy in common hallways even when they are secured against access by the general public); *State v. Nguyen*, 841 N.W.2d 676, 680-81 (N.D. 2013) (same).[7]

Application of the *Dunn* factors to the instant case counsels against our holding that the area immediately surrounding Appellee's front door constitutes curtilage. There is no question that the proximity factor suggests curtilage; but that is the only factor that does. There was no enclosure surrounding Appellee's front door. It was open for any passerby directly to see, and Appellee took no steps (nor is there any showing that, by the terms of his lease, he would have been permitted to take steps) to obscure the public view. And, while there was evidence that some of Appellee's neighbors took advantage of the walkways immediately proximate to *their* front doors—apparently regarding that space as available for some limited measure of domestic intimacy (if not exactly privacy)—Appellee himself did not. The court of appeals placed some emphasis on the fact that the walkway from the left of the top of the stairs led only to Appellee's apartment, and no other. *Rendon*, 2014 WL

---

[7] In the recent case of *Chiarini v. State*, 442 S.W.3d 318, 325 (Tex. Crim. App. 2014), we held that a condominium owner's "undivided ownership interest in the common area of the condominium complex made the common area [his] 'own premises' under the [Unlawful Carrying Weapons] statute." That is to say, he could not be convicted for unlawfully carrying a weapon, since he carried the weapon on his "own premises." Tex. Penal Code § 46.02(a)(1). This holding has no bearing upon whether the threshold of Appellee's apartment constitutes "curtilage" for Fourth Amendment purposes.

6881630, at *4. But this fact, while not wholly irrelevant, does not ultimately change the calculus. The walkway remained fully available to public view and public access, and, all other *Dunn* factors being considered, the fact that it led only to Appellee's threshold does not establish the degree of intimate use and privacy necessary to equate it with the home. I conclude that Stover and Baco did not invade the curtilage of Appellee's apartment.[8]

## Does *Jardines* Change the Concept of Curtilage?

Nothing about the Supreme Court's opinion in *Jardines* persuades me otherwise. In *Jardines*, the Supreme Court reiterated that the reasonable-expectation-of-privacy formulation for defining the parameters of a "search" for Fourth Amendment purposes, introduced in *Katz v. United States*, 389 U.S. 347 (1967), was not exhaustive. 133 S.Ct. at 1414 (citing *United States v. Jones*, 132 S.Ct. 945, 950-51 & n.3 (2012)). Instead, the *Katz* formulation had merely added to an already existing "baseline" of Fourth Amendment

---

[8] The concurring opinion argues that "[a]n apartment should be afforded some curtilage that carries with it the same protections under *Jardines* as the curtilage of a house." Concurring Opinion at 2. Of course, I agree that whatever constitutes the "curtilage" of an apartment enjoys the same constitutional status as whatever constitutes the curtilage of a privately owned home. Nobody disputes that. And almost any home will have some "curtilage." Still, what constitutes "curtilage" will vary depending upon the nature of the dwelling involved. A rural farm house and an urban high-rise apartment are equally deserving of Fourth Amendment protection, but identifying their respective "curtilages" involves different considerations. Some might be concerned that the holding I would reach today would tend to favor well-off home-owners over their less affluent apartment dwelling neighbors. But any such discrimination is attributable to the nature of the dwellings themselves, not the economic status of their occupants. It is an unfortunate fact of life that homeless people have no curtilage at all, since they have no home from which the intimacies of domestic life may extend. Does the car in which the homeless man may be forced to live constitute a "home" in contemplation of *Payton v. New York*, 445 U.S. 573 (1980)? Surely we would not regard the folding chair that a homeless man sets up on the sidewalk next to his parked car as "curtilage" simply to compensate for his poverty.

protection—a baseline "that for much of our history formed the exclusive basis for its protections: When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a "search" within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'" *Id*. (quoting *Jones*, 132 S.Ct. at 950-51, n.3). Because the dog sniff in *Jardines* was an investigation conducted from the vantage of the curtilage of the defendant's home—and for that reason alone—it entailed an unconstitutional intrusion into the defendant's "house"—one of the very entities singled out for security from unreasonable searches by the Fourth Amendment, along with "persons, . . . papers, and effects[.]"

That the defendant's front porch in *Jardines* constituted part of the curtilage of his house was taken by the majority as practically a given: "Here there is no doubt that the officers entered it: The front porch is the classic exemplar of an area adjacent to the home and to which the activity of home life extends." *Id*. at 1415 (internal quotations and citation omitted). The only question was whether the usual "license" implicit in the fact that convention allows the public to approach the front door of a residence to knock was broad enough to embrace the use of a trained canine to sniff the air outside the door for contraband drugs. *Id*. "There is no customary invitation[,]" the Supreme Court concluded, "to do *that*." *Id*. at 1416. Thus, the "objective behavior" of the investigating police officers demonstrated that the purpose of their entry upon the curtilage did not fall within "what anyone would think [they] had license to do." *Id*. at 1417. It was for this reason that the majority concluded that the dog sniff amounted to a search—because it was facilitated by an unlicensed invasion

of the curtilage. The Supreme Court considered any necessity to inquire about Jardines's expectation of privacy (if any—objectively reasonable or otherwise) to be rendered unnecessary by its "baseline" conclusion that the curtilage of his house had been invaded without his explicit or implicit permission. *Id*.

I do not believe any aspect of *Jardines* alters the validity of my conclusion that the area in front of Appellee's apartment did not constitute curtilage—either under *Jardines*'s "baseline" approach to determining what constitutes a search, or under *Katz*'s reasonable-expectation-of-privacy approach that *Jardines*'s "baseline" approach rendered unnecessary. Addressing first *Jardines*'s "baseline" approach, I ask: Was there an intrusion on Appellee's "house" within contemplation of the Fourth Amendment? Although the opinion in *Jardines* is less explicit than one might wish in saying so, Jardines's dwelling was a stand-alone "house" rather than an apartment in a multi-dwelling residential complex like Appellee's. 133 S.Ct. at 1414. Jardines was the "homeowner," not a renter, and the area "immediately surrounding his house" actually "belong[ed] to" him. *Id*. He therefore enjoyed the right to exclude others from his property, subject only to the "license" usually afforded to outsiders to enter upon the curtilage insofar as custom—"the background social norms that invite a visitor to the front door"—allowed. *Id*. at 1415-16. Appellee could exercise no such right to exclude others from the area in front of his apartment. I therefore have no occasion in this case to conduct the same "scope-of-the-license" analysis that the Supreme Court undertook in *Jardines*. There simply was no physical intrusion upon any area "belonging to" Appellee

to begin with, as there was in *Jardines*.

Appellee fares no better under *Katz*'s reasonable-expectation-of-privacy approach to the curtilage question. Here the question to ask is: Regardless of whether Appellee enjoyed an ownership interest (or even a possessory interest) in the area immediately surrounding the front door to his apartment, did he nevertheless evince a subjective expectation of privacy in that space, and would society recognize any such subjective expectation of privacy as objectively reasonable under the circumstances? *Katz*, 389 U.S. at 361 (Harlan, J., concurring). To me, the answer is "no" on both counts—for essentially the same reasons I have already concluded that Appellee cannot satisfy the *Dunn* standard for constitutionally protected curtilage. Nothing in the record establishes that Appellee subjectively expected the walkway at his front door to remain private, and he did not put it to any use associated with the intimacies of the home even as some of his neighbors had done. In any event, given the highly exposed nature of all of the apartment walkways, I cannot conclude that any subjective expectation of privacy that Appellee or his neighbors may have manifested was objectively reasonable. *See State v. Williams*, 862 N.W.2d 831, 837-38 (N.D. 2015) (in a post-*Jardines* case involving a narcotics dog sniffing in the common hallway of a condominium complex, "the condominium building's common hallway was not curtilage," so the canine sniff did not constitute a search). I therefore persist in my view that Appellee has not established that anything amounting to the curtilage of his home was compromised.[9]

---

[9] The Court is careful today to limit its holding to dog-sniffs that occur at the very threshold of an apartment door. Majority Opinion at 11. But there is nothing talismanic about the threshold of

**Does Curtilage Even Matter?**

There remains a colorable argument, suggested by Justice Kagan's concurring opinion in *Jardines*, that a drug dog sniff at the doorstep of a residence should be regarded as a search even if the dog is not on the curtilage. The argument posits that, because the dog's olfactory sense is capable of invading the interior of the home, and because the home is, as *Jardines* acknowledged, "first among equals" when it comes to Fourth Amendment protection, 133 S.Ct. at 1414, the use of a drug dog to detect contraband within the home constitutes a search. Justice Kagan's concurring opinion in *Jardines* articulated this position. While joining the majority's "baseline" approach, Justice Kagan, joined by Justices Ginsburg and Sotomayor, argued separately that, "[i]f we had decided this case on privacy grounds, we would have realized that *Kyllo v. United States*, 533 U.S. 27 (2001), already resolved it." 133 S.Ct. at 1419 (Kagan, J., concurring).

In *Kyllo*, the Supreme Court carved out the following rule:

Where . . . the Government uses a device that is not in general public use [in *Kyllo* itself, a thermal imaging device], to explore details of the home that

---

a home. *See Illinois v. McArthur*, 531 U.S. 326, 335 (2001) ("This Court has held . . . that a person standing in the doorway of a house is 'in a public place,' and hence subject to arrest without a warrant permitting entry of the home."). Unless the police have actually *crossed* that threshold, or unless they have arrived at the threshold by way of a trespass or an invasion of the homeowner's legitimate expectation of privacy, the Fourth Amendment is not implicated. In *Jardines*, the police physically trespassed upon the premises. There was no such trespass here. There is no evidence that Baco ever touched the threshold of the apartment door, much less crossed it. And it simply begs the question to reason that standing at the threshold of an apartment—"home" though it may be—is necessarily curtilage or constitutes an invasion of a legitimate expectation of privacy *per se*, no matter how freely accessible and observable to the general public the area immediately in front of that threshold may be.

would previously have been unknowable without physical intrusion, the surveillance is a 'search' and is presumptively unreasonable without a warrant.

533 U.S. at 40. Following Justice Kagan's lead, and regarding a narcotics detecting dog to be a "device not in general use" that is capable of invading the interior of a home to discover what could not otherwise be known "without physical intrusion," at least one court since *Jardines* has held that a dog sniff conducted from outside the front door of a condominium unit constituted an invasion of the home itself, and was therefore a search. *See State v. Kono*, No. CR120264061, 2014 WL 7462049, at *4 (Conn. Super. Nov. 18, 2014) (not designated for publication) ("The use of a drug detection dog to investigate the contents of a home is no less a 'sense-enhancing technology' not in general public use than was the thermal imaging device in *Kyllo*."). *See also*, *State v. Ortiz*, 600 N.W.2d 805, 814-17 (Neb. 1999) (recognizing "some expectation of privacy to be free from police canine sniffs for illegal drugs in the hallway outside an apartment or at the threshold of a residence").

It is difficult to square this view, however, with earlier Supreme Court holdings with respect to the use of narcotics dogs. In *United States v. Place*, 462 U.S. 696 (1983), and *Illinois v. Caballes*, 543 U.S. 405 (2005), the Supreme Court concluded that the use of a narcotics dog to sniff for contraband in luggage (*Place*) and a car (*Caballes*), respectively, did not constitute a search under the Fourth Amendment. These holdings were not predicated on any perceived lesser expectation of privacy inhering in these ordinarily protected personal "effects." Instead, the Supreme Court focused on the nature of the dog sniff itself. A narcotics dog is trained to alert only to the presence of illicit contraband. *See Caballes*, 543 U.S. at 409

("[A] canine sniff by a well-trained narcotics-detection dog [is] 'sui generis' because it 'discloses only the presence or absence of narcotics, a contraband item.'") (quoting *Place*, 462 U.S. at 707). It does not otherwise "explore details of the home that would previously have been unknowable without physical intrusion[.]" *Kyllo*, 533 U.S. at 40. And a person has no reasonable expectation of privacy in possessing narcotics. *Caballes*, 543 U.S. at 408 (official conduct that does not compromise a legitimate interest in privacy is not a search, and possession of contraband does not implicate a legitimate privacy interest). Distinguishing *Kyllo*, the Supreme Court in *Caballes* observed that the thermal imaging device there was capable of detecting many intimate details of the interior of a home besides the possible presence of contraband. 543 U.S. at 409.[10] But "[t]he legitimate expectation that information about perfectly lawful activity will remain private is categorically distinguishable from respondent's hopes or expectations concerning the nondetection of contraband in the trunk of his car." *Id*. at 410.

Given the rationale underlying the holdings in *Place* and *Caballes*,[11] one court

---

[10] *See* Kenneth J. Melilli, *Dog Sniffs, Technology, and the Mythical Constitutional Right to Criminal Privacy*, 41 HASTINGS CONST. L.Q. 357, 377 (Winter 2014) ("The drug dog simply indicates a yes or a no to the question of the presence of illegal drugs, and neither answer implicates any legitimate expectation of privacy. Moreover, because the drug dog cannot convey any other information, drug sniffs create no risk of intruding upon legitimately private matters.") (internal quotations and footnotes omitted).

[11] *See also Indianapolis v. Edmond*, 531 U.S. 32, 40 (2000) (citing *Place* for the proposition that a drug sniff of a car stopped at a highway checkpoint "does not transform the seizure into a search" because "an exterior sniff of an automobile does not require entry into the car and is not designed to disclose any information other than the presence or absence of narcotics").

observed in 2004 that "[a] dog that can determine contraband's existence and nothing else is not a search, even when sniffing the exterior of a home." *Fitzgerald v. State*, 864 A.2d 1006, 1016 (Md. 2004). *See also*, *United States v. Scott*, 610 F.3d 1009, 1015-16 (8th Cir. 2010) (rejecting the argument that a narcotics dog's sniff of "the exterior door frame" of the defendant's apartment from the common hallway was a search under *Kyllo*). After *Jardines*, of course, this observation must be qualified: A drug dog sniff outside the home is not a search so long as the dog is not invading the home's curtilage at the time. In a very recent post-*Jardines* case, the Sixth Circuit held that *Jardines* does nothing to unsettle the proposition that a dog sniff does not constitute a search under the Fourth Amendment so long as it is conducted by law enforcement from an area where they have a legal right to be. *United States v. Winters*, 782 F.3d 289, 306 (6th Cir. 2015).[12] I think these opinions express the better reasoned view and would have the Court follow them here.[13]

---

[12] In the recent case of *Rodriguez v. United States*, 135 S.Ct. 1609 (2015), the issue was not whether the narcotics dog's drug sniff of the defendant's car constituted a search for Fourth Amendment purposes. Instead, the Supreme Court held that law officers may not extend the bounds of an ordinary traffic stop in order to effectuate that dog sniff without violating the defendant's Fourth Amendment protection against unlawful seizures of his person. *See id.* at 1615 ("[A] dog sniff is not fairly characterized as part of the officer's traffic mission."); *see also, Winters*, 782 F.3d at 304 (distinguishing the issue in *Rodriguez*).

[13] *See* Melilli, 41 HASTINGS CONST. L.Q. at 379 ("The simple truth is that dog sniffs, and any other real or hypothetical technique that can disclose nothing more than the presence or absence of criminal activities, are not searches under the Fourth Amendment. It is clear from the operation of the Amendment that it was never designed with the ambition of insulating criminal activity from detection. In practice, the concealment of criminal behavior is often made possible by the Fourth Amendment, but only as a collateral cost of protecting our privacy for noncriminal matters. When a technique exists for exposing criminal evidence without any risk whatsoever of exposing legitimately private matters, the use of that technique is entirely consistent with Fourth Amendment values and concerns that constitutional freedoms are being eroded are misplaced.") (internal

## CONCLUSION

Because I believe Detective Stover and Baco did not invade the curtilage of Appellee's apartment, the drug sniff conducted at the threshold of Appellee's door, where they had a legal right to be, did not, in my opinion, constitute a search for Fourth Amendment purposes. In my opinion, the contrary judgment of the court of appeals should be reversed, and the cause should be remanded to the trial court for further proceedings consistent with this opinion. Because the Court instead affirms the judgment of the court of appeals, I respectfully dissent.

FILED:       December 16, 2015
PUBLISH

---

quotations and footnote omitted).